.Black and others, Executors, Appellants, vs. The State and another, Respondents.

*January 7—February 18, 1902.*

*Taxation on inheritances: Estates of decedents: Construction of stat-utes: Classification for taxation:˙Exemptions: Reasonableness:. Constitutional law.*

1. Inheritance or succession taxes are taxes upon the right to re-ceive property, and not upon property itself.

2. Ch. 355, Laws of 1899, authorizes the taxation of inheritances, de-vises, bequests, gifts, or sales in contemplation of death, so far as they affect personal property or any interest therein, of the· value of $10,000, or more.  Sec. 19 thereof defines "property" and "estate," as used in the act, to mean the property or inter-est therein of the testator, intestate, grantor, bargainor or· vendor, and not the property or interest passing to the individ-ual beneficiary.  *Held*, that sec. 19 operates to apply the lim-itations of the act to the aggregate value of the entire prop-erty or estate transferred, and not to the share of each indi-vidual beneficiary.

3. Under sec. 1, art. VIII, Const., providing that the rule of taxa-tion shall be uniform; and under the equality in the protec-tion of the laws guaranteed by sec. 1, art. I, Const., and the· XIV amendment to the federal constitution, a classification of' persons or property liable to or exempt from taxation does not violate the required rule of uniformity and equality, provided such classification be founded on real differences, affording ra-tional grounds of distinction, and the exemption be reasonable in amount.

4. It being a recognized right of the legislature to make reasonable exemptions in the tax laws of the state, the provisions of' ch. 355, Laws of 1899, exempting from an inheritance tax all estates under $10,000 in value, cannot be said to be unreason-able as to amount.

5. Under the foregoing constitutional limitations, while classifica-tion is proper, there must be uniformity within the class; and the provisions of ch. 355, Laws of 1899 (authorizing an in-heritance tax where the whole estate is $10,000 in value, or over, but not authorizing such tax where the estate is less than $10,000 in value, the beneficiaries being of the same class, and the tax being levied without regard to the amount received by the individual beneficiary), are *held* unconstitutional, as being

an arbitrary and unlawful discrimination between beneficiaries of the same class.

6. MARSHALL, J., is of the opinion that the right to transmit property is not a mere privilege from sovereign authority and subject to absolute legislative control, but is a right, the enjoyment of which is protected by constitutional guaranties, though its character, in that regard, is not inconsistent with legislative authority to impose reasonable burdens, in the nature of taxes, upon the right to take by the will of a deceased person, or under statutory regulations in regard to the distribution of the estates of intestates.

APPEAL from a judgment of the circuit court for Milwaukee county: EUGENE S. ELLIOTT, Circuit Judge. *Reversed.*

This is an appeal from a judgment of the circuit court of Milwaukee county requiring the executors of the estate of John Black, deceased, to pay an inheritance tax upon the personal property transferred by the will of said deceased.

The judgment appealed from affirmed a previous decree of the county court of Milwaukee county, both judgments being based upon the following stipulated facts:

"That John Black, said deceased, was a citizen, inhabitant, and taxpayer of the city and county of Milwaukee and state of Wisconsin for more than ten years prior to and up to the time of his death, which occurred on October 25, 1899, and that the personal property of said John Black during his lifetime, and especially during the years 1898 and 1899, was taxable in the city and county of Milwaukee, state of Wisconsin, and was assessed by the proper authorities of the city and county of Milwaukee, state of Wisconsin, for taxation, as hereinafter set forth; that said John Black did not make any statement in relation to his personal property, nor did he practice any concealment or fraud in relation thereto; that in 1898 he was assessed for personal property $56,950, and in 1899 he was assessed for personal property $58,720, as appears by the tax roll of the proper authorities of said city and county of Milwaukee in said years, respectively, and that said John Black did pay the said personal tax so assessed and levied upon his said personal property for the year 1898 in

the month of January, 1899, and that the executors of said John Black did pay all the taxes so assessed on said personal property of said deceased for the year 1899 on the 4th day of January, 1900, and that said personal taxes so paid by said executors were paid from the estate and funds of said John Black, deceased; that, all and singular, the personal property described in the inventory on file in this matter, and owned by the said John Black at the time of his death, was owned and possessed by said John Black on and prior to the first day of May, 1898, and thereafter continuously down to the time of his death, and during all of such time such personal property was of the value of $354,697.92; that at the time of his death said deceased owed no debts whatever; that at the time of his death, and for some years previously, said deceased owned valuable real estate situated in said Milwaukee county, in addition to said personal property, and that there is now, and has been for more than five years last past, real estate in said county which is taxable of the value of more than $10,000,-000; that the said personal property owned by said John Black at the time of his decease as aforesaid was disposed of and bequeathed by him by his last will and testament as follows: One thousand dollars to the Home of the Aged; two thousand dollars to the St. Rose Orphan Asylum; one thousand dollars to the Rt. Rev. Archbishop Katzer in trust for the use and benefit of St. John's Catholic parish; which said sums, amounting to four thousand dollars [$4,000] in all, were bequeathed to corporations organized for religious, charitable, and educational purposes, solely for their use and benefit, and solely for the purposes of their organization; two thousand dollars to Mrs. Louise B. Stamm, sister-in-law of the said deceased; two thousand dollars to Barney S. Schoeffel, brother-in-law to said deceased, which said last two named persons were not related to said deceased in any degree or relationship described, mentioned, or specified in section 2 of chapter 355 of the Laws of Wisconsin for the year 1899; two thousand dollars to Katherine Mayer, a sister of the deceased; two thousand dollars to Peter Black, a brother of said deceased; and all the rest and residue of said personal property, to Elizabeth M. Black and Louise C. Clark, children and daughters of said deceased."

Upon these facts, the court decided that the estate was liable to pay the following taxes:

| | | |
|---|---|---|
| A tax of five per cent. on the transfer of $2,000 to said Louise B. Stamm .................................... | $100 | 00 |
| A tax of five per cent. on the transfer of $2,000 to said Barney S. Schoeffel ................................. | 100 | 00 |
| A tax of one per cent. on the transfer of $2,000 to said Katherine Mayer .................................... | 20 | 00 |
| A tax of one per cent. on the transfer of $2,000 to said Peter Black ....................................... | 20 | 00 |
| A tax of one per cent. on the transfer of $285,747.92, the undivided interest in said Elizabeth M. Black and Louise C. Clark, residuary legatees of said deceased .......... | 2,857 | 48 |
| Total .......................................... | $3,097 | 48 |

As conclusions of law, the court determined that ch. 355, Laws of 1899, under which the inheritance tax aforesaid was imposed, was a valid law; that the words "*estate* and *property*," as used in that law, referred not to the property of the individual transferee, but to the entire property or estate of the decedent; that the payment of the tax assessed on a part of said personal property for the years 1898 and 1899 does not exempt the entire estate from the payment of an inheritance tax, but that the amount on which taxes were paid for said year 1898 should be deducted from the clear market value of the personal property of the deceased at the time of his death, and the balance thereof subjected to the payment of an inheritance tax.    Judgment was entered in accordance with these findings.

For the appellants there was a brief by *Winkler, Flanders, Smith, Bottum & Vilas,* and oral argument by *F. C. Winkler* and *J. G. Flanders.*

For the respondents there was a brief by the *Attorney General,* and a separate brief by *W. H. Bennett,* district attorney, and *F. E. McGovern,* assistant district attorney, of counsel, and oral argument by the *Attorney General* and *Mr. McGovern.*   To the point that the act was constitutional,

were cited, Dos Passos, Inheritance Tax L. § 13; *In re Swift,* 137 N. Y. 77; *Eyre v. Jacob,* 14 Grat. 427; 5 Polit. Sci. Quart. 637; *Wis. Cent. R. Co. v. Taylor Co.* 52 Wis. 37; *Minot v. Winthrop,* 162 Mass. 113; *State v. Alston,* 94 Tenn. 674; *Magoun v. Ill. T. & S. Bank,* 170 U. S. 283; *State ex rel. Sanderson v. Mann,* 76 Wis. 477; *Matter of McPherson,* 104 N. Y. 306; *Matter of Sherwell,* 125 N. Y. 379; *Matter of Hoffman,* 143 N. Y. 327; *U. S. v. Perkins,* 163 U. S. 625–628; *Mager v. Grima,* 8 How. 490; *Kochersperger v. Drake,* 167 Ill. 122; *Strode v. Comm.* 52 Pa. St. 181; *State v. Hamlin,* 86 Me. 495; *State ex rel. Gelsthorpe v. Furnell,* 39 L. R. A. 170; *Union Trust Co. v. Durfee,* 125 Mich. 487; *Tyson v. State,* 28 Md. 577; *State v. Dalrymple,* 70 Md. 294; *Shorley v. Rew,* 23 Wall. 331; Cooley, Taxation, 570, 584.

WINSLOW, J.   In the present case ch. 355, Laws of 1899, entitled "An act for a tax on gifts, inheritances, bequests and legacies in certain cases," is attacked as unconstitutional. The act in question provides for the imposition of a tax upon any transfer of personal property of the value of $10,000 or over, or of any interest therein or income therefrom, in trust or otherwise, to any persons or corporations, except corporations organized for religious, charitable, or educational purposes, which use the transferred property solely for such purposes, in the following cases:   (1) when the transfer is by will or by the intestate laws of this state from any person dying possessed of the property while a resident of this state; (2) when the transfer is by will or intestate law of property within this state, the deceased being a nonresident at death; (3) when the transfer is made by a resident or by a nonresident, the nonresident's property being within the state, by bargain, sale, or gift made in contemplation of the death of the vendor or donor, or intended to take effect at or after such death.   The act further provides that the tax shall be im-

posed when any beneficiary is entitled to such property by any such transfer, whether made before or after the passage of the act, and that the tax shall be at the rate of five per centum per annum upon the clear market value of the property transferred, except that when the property passes to the decedent's father, mother, husband, wife, child, brother, sister, and certain other specified near relatives, it shall not be taxed unless of the value of $10,000 or more, and then only at the rate of one per centum upon the clear market value thereof.  The law also provides that such tax shall be a lien upon the property transferred until the tax is paid, and contains full and specific administrative provisions regulating the manner in which it is to be collected, the appraisal of the property, and the powers and duties of district attorneys, the county courts, and the secretary of state in the matter of making collection of such taxes.  All taxes so collected, less expenses of collection, are to be paid into the state treasury, to be used for the expenses of the state government, and for such other purposes as the legislature shall direct, but the county treasurer is to retain for the use of his county fifteen per cent. of any tax collected in his county.  Sec. 19 of the act, among other definitions, defines the words "estate" and "property," as used in the act, to mean the property or interest therein of the testator, intestate, grantor, bargainor or vendor, and not the property or interest passing to individual legatees, devisees, heirs, next of kin, donees, or vendees.  A number of sections of the act were amended by ch. 245, Laws of 1901, but none of the amendments affect in any material respect the provisions of the law which are attacked in this case, and hence it is not deemed necessary to state the effect of the amendments.

The tax which this law authorized is what is generally known as an "inheritance" or "succession" tax.  Such taxes are very ancient in origin, and have been long in use, especially in European states.  The states of the Union have been

singularly slow in adopting such laws, but the number of
states to adopt and enforce them is increasing year by year.

To review the history of such legislation would be a mere
affectation of learning, and would serve no useful purpose in
the decision of this case. The Wisconsin tax commission, in
their report submitted to the legislature in the year 1898,
justly say:

"It is very clear that the overwhelming weight of judicial
authority sustains legislation of this character, and equally
clear that, in the wealthiest and also the most progressive
states, statutes exist or are being enacted for the collection
of succession taxes."

It was doubtless in response to the favorable recommenda-
tion of the commission that the present law was passed at
the following session of the legislature. Examination of the
law shows that it is in all essential respects a literal copy of
the New York law (ch. 399, Laws of 1892, as amended),
with the important exceptions that in the New York law all
transfers to collateral kindred and strangers of the value of
$500 or over are taxed, while in the Wisconsin law such trans-
fers are not taxed unless they equal or exceed $10,000, and
that in New York the tax is imposed upon transfers of both
real and personal property, while in Wisconsin it is confined
to personal property alone. Sec. 19 of the Wisconsin law,
so far as it defines the words "estate" and "property," is
identical with sec. 22 of the New York law. It will be well
to ascertain at the outset what construction had been placed
upon the New York law before we adopted it, because, upon
very familiar principles, so far as the provisions are identical,
or substantially so, such construction must be followed here.
The law first appeared upon the statute books of New York
as ch. 483, Laws of 1885, and it was then purely a law taxing
collateral inheritances or transfers exceeding $500, at the rate
of five per cent. Inheritances or transfers to lineal descend-
ants and certain near relatives were entirely excepted from

its operation. This law was challenged as unconstitutional. in In re Will of McPherson, 104 N. Y. 306. The principal grounds upon which it was challenged were (1) that it violated a clause of the New York constitution providing that every law imposing a tax "shall distinctly state the tax and the object to which it is to be applied"; (2) that it did not provide for notice or opportunity to be heard, and so was not "due process of law"; and (3) that it conferred prohibited powers upon surrogates' courts. All these objections were overruled, and the law sustained. The question whether it was a tax on property, or a tax upon the succession or devolution of property, was not decided. It is said that in either case it is constitutional, because it has never been questioned that the legislature may tax sales of property, incomes, acquisitions, and transfers of property, and that, if it be regarded as a tax on property, then it is free from objection if it be equally imposed and properly apportioned upon all property of the class to which it belongs. The act was amended by ch. 713, Laws of 1887, but not in any respect material to the present discussion. It still remained purely a collateral inheritance tax law. Two cases were decided immediately following the amendment, viz., In re Cager's Will, 111 N. Y. 344, and In re Estate of Howe, 112 N. Y. 100; but the only material question decided in these cases was that the $500 limitation in the act referred to the portion of the property passing to the legatee or beneficiary, and not to the whole estate left by the testator or grantor. Then followed, after an interval, the case of In re Estate of Swift, 137 N. Y. 77, in which it was distinctly held that the tax is not a tax on property, but on the right of succession or devolution. The first case arising under the law of 1892, which, as has been said, is the prototype of our own law, was the case of In re Hoffman's Estate, 143 N. Y. 327, in which it was held that the tax was still upon the right of succession, and not upon the property of the decedent's estate, but that by

sec. 22 of the act (corresponding to sec. 19 of our act) the
construction given to the previous law in the *Cager* and *Howe
Cases,* to the effect that the limitation of $500 applied to the
individual shares received, and not to the whole estate of the
grantor, was reversed, and that the limitation under the act
of 1892 applied to the aggregate value of all the property
transferred, and not to the separate value of each individual
transfer.    In the case of *In re Dows's Estate,* 167 N. Y. 227
(decided two years after our statute was passed), it was
again held that the tax was a tax on the right of succession,·
and not on the property. It is not believed that there are other
cases in New York throwing light upon the question.    There
is one respect in which we receive help from the New York
decisions, and that is as to the construction of sec. 19 of our
act which defines "estate" and "property."    The New York
courts having held before our adoption of the section that it
operated to apply the limitations of the act to the aggregate
value of the entire property or estate transferred, and not to
the share of each individual beneficiary, we must and do
apply the same construction to the section.

In other respects, however, the New York decisions give
us little, if any, help.    The only time that the question of
constitutionality was considered by that court was in the early
case of *In re McPherson, supra;* and the law then challenged
was the collateral inheritance law of 1885, which simply lev-
ied a tax of five per cent. on all collateral inheritances or
transfers exceeding $500 in amount.    This was a uniform
tax without discrimination, upon all persons belonging to a
certain and properly defined class.    Were this the law now on
our statute books, we should have no difficulty in sustaining
it, even under our own constitution.    It seems to have been at-
tacked on grounds entirely foreign to the present discussion,
arising out of provisions of the constitution of New York
which are peculiar to itself.    The constitution of that state
contains no provisions as to uniformity of taxation, although

it does contain the usual guaranties of equality before the law of all citizens. Const. N. Y. art. I, secs. 1–6. Whether the act of 1892 in any respect violates such rule of equality, or infringes upon the fourteenth amendment to the constitution of the United States, which prohibits any state from denying "to any person within its jurisdiction the equal protection of the laws" are questions which have never been raised or passed upon in the state of New York, so far as we are able to ascertain.

Taking the law, then, with this construction of the words "estate" and "property," we are to consider the question as to its constitutionality. The appellants' claim is that the act violates sec. 1, art. VIII of our constitution, providing that "the rule of taxation shall be uniform and taxes shall be levied upon such property as the legislature shall provide"; also that it denies the equal protection of the laws, in violation of the fourteenth amendment to the federal constitution.

In entering upon the discussion of this question, the appellants' counsel, with characteristic candor and fairness, concedes (1) that there is no objection to a succession tax, as such, and that it is not a tax on the property of the estate already taxed; (2) that the right or privilege of receiving property upon the death of the former owner is so far different from other property or subjects of taxation that it may well be classed by itself; (3) that a classification which makes differences between descendants, collateral relatives, and strangers to the blood is founded in reason, and may be sustained; but he says that all who fall within any one class must be treated by the same rule, and, if they are not so treated, the law is discriminating and arbitrary, and under it not only is the provision requiring uniformity of taxation violated, but men do not stand equal before the law.

There are two ways in which it is said that this law discriminates between members of the same class: *First.* No tax is to be collected unless the value of the whole estate trans-

ferred equals or exceeds $10,000, but, if it does exceed $10,000, then the tax is to be paid upon the *whole property.* Thus while one collateral heir, who receives $9,900 from one estate, pays nothing, another, belonging to the same class, who receives just $10,000 from another estate, is required to pay a tax upon his whole legacy. This is said not to be exemption, but unjust discrimination. *Second.* Suppose A. and B. die possessed of estates of the net value of $9,900 and $10,100, respectively, and each having made a will bequeathing his property to collateral kindred in the same class; the man who receives $2,000 under A.'s will pays no tax, while the man who receives $2,000 under B.'s will is obliged to pay a tax, though each is of kin in the same degree to his respective testator, and hence belongs to the same class.

These contentions are met by the respondents by the proposition that only taxes levied upon *property* are required to be uniform; this is a tax upon a privilege granted by law, namely, the privilege of inheriting property or receiving the same by will; the privilege is not a natural right, but purely a privilege granted by law, and it may be modified or repealed at the will of the legislature, subject only to constitutional provisions.

The result of this doctrine, if logically carried out, seems to be that the legislature may take away the right of inheritance and the right of disposing of property by will entirely, and provide that, after payment of debts, all the property of a deceased person shall revert to the state, unless there is some direct constitutional provision preventing such a law. This is certainly a startling proposition. It seems to have been first formulated in the case of *Eyre v. Jacob,* 14 Grat. 430, where the court says:

"The legislature might, if it saw proper, restrict the succession to a decedent's estate by devise or descent to a particular class of his kindred,—say, to his lineal descendants or ascendants; it might impose terms or conditions upon which

collateral relations may be permitted to take it; or it may to-morrow, if it please, absolutely repeal the statute of wills and that of descents and distributions, and declare that upon the death of a party his property shall be applied to the payment of his debts, and the residue appropriated to public uses."

The language used was simply by way of argument. No such law was before the court, nor has such a law as the one supposed been before any court since that time, though the idea expressed by the Virginia court has been referred to several times by other courts. *Mager v. Grima,* 8 How. 490; *Magoun v. Ill. T. & S. Bank,* 170 U. S. 283; *State v. Hamlin,* 86 Me. 495. When such a law presents itself to any court of last resort, it will deserve very serious consideration before it can be approved. We intimate no opinion upon the proposition,—certainly no favorable opinion. It is enough for the purposes of the present case that it be held, in accordance with the law as laid down by the great weight of authority, and as conceded by the appellants, that *reasonable* succession taxes are unobjectionable, provided no constitutional inhibition be violated.

Starting from this basis, and considering the question of the supposed unlawful discrimination or lack of uniformity in the provisions of the law, we find, in the first place, no direct adjudications upon the subject in our own court. The cases of *Wis. Cent. R. Co. v. Taylor Co.* 52 Wis. 37; and *State ex rel. Sanderson v. Mann,* 76 Wis. 469, are cited as affecting in some degree the questions in the present case, but examination shows that neither of them has more than a remote bearing thereon. In the first case cited it was held that, under the constitutional mandate as to taxation, the legislature may prescribe the property to be taxed, and prescribe the rule by which it is to be taxed, subject to the limitation that the rule must be uniform, and that it was competent for the legislature to place certain lands held in trust by the state for the railway company in a class, and exempt

them from taxation for a term of years; that this was classification founded on rational grounds and was not arbitrary discrimination. It is uniformity of rule, and not uniformity of subjects, which the constitution requires. Subjects may be classified, and, if the classification be reasonable and founded on rational grounds, it will be sustained. In the second case cited it was held that a law imposing a tax upon estates, regardless of their solvency, in counties having more than 150,000' population, was a special law for the assessment and collection of taxes, applicable only to Milwaukee county, and void under the constitutional provision that such laws shall be uniform in their operation throughout the state. It was said that the law in question was not a succession tax, because imposed on the whole estate, regardless of solvency; that a succession tax is essentially a tax on the transmission of property, and not, properly speaking, a tax upon the property transmitted; and the question whether a succession tax could lawfully be imposed under our constitution was expressly left undecided.

Thus the principle was recognized in the *Sanderson Case* which is universally laid down in the authorities,—that a succession tax is a tax on the privilege of receiving property, and not a tax upon property. As said by the supreme court of the United States in *Magoun v. Ill. T. & S. Bank,* 170 U. S. 283, concerning such taxes:

"An inheritance tax is not one on property, but on the succession. The right to take property by devise or descent is the creature of the law, and not a natural right,—a privilege,—and therefore the authority which confers it may impose conditions upon it. From these principles it is deduced that the states may tax the privilege, discriminate between relatives, and between these and strangers, and grant exemptions, and are not precluded from this power by the provisions of the respective state constitutions requiring uniformity and equality of taxation."

It is really not a matter of great importance in this case to decide whether an inheritance tax is subject to the constitutional provision that the rule of taxation shall be uniform. Considering the clause without undue refinement of reasoning, it is difficult to see why it does not apply to an inheritance or succession tax. It is true such a tax is called an excise in the decisions. An excise is a duty levied on articles of sale or manufacture, upon licenses to pursue certain trades or deal in certain commodities, upon official privileges, etc. Cooley, Taxation (2nd ed.), 4. But when such duty is levied upon a trade, occupation, or privilege as a means of producing revenue alone, and not in exercise of the police power, it is, to all intents and purposes, an exercise of the taxing power, and no good reason is perceived why such taxation is not included within the taxation referred to in the constitution in the clause quoted. The argument against this position is that the words immediately following this clause, namely, "and taxes shall be levied upon such *property* as the legislature shall prescribe," indicate that it is a taxation of property alone which the section covers. The history of the two clauses given by the present Chief Justice in the case of *Wis. Cent. R. Co. v. Taylor Co.* 52 Wis. 37, perhaps affords some color to the idea that it is the taxation of property alone which is referred to by the section. We do not regard this question, however, as one of supreme importance in this case. Grant, if you please, that such taxation as the present be not included in the word taxation as used in the constitutional provision quoted; there is still the fourteenth amendment to the federal constitution to be considered; there is still the principle upon which every constitution in the Union is founded to be reckoned with, namely, the principle that all men are equal before the law, and that life, liberty, and property are secured to all alike. The emphatic protest against special privileges to any favored persons or class of persons may be found in varying terms in all of our constitutions. Our

fathers came here to escape the reign of privilege, and they made equality before the law the very corner stone of their plan of government. In our own constitution it is thus expressed, in sec. 1, art. I:

"All men are born *equally* free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted among men deriving their just powers from the consent of the governed."

This may be said to be somewhat vague and general,— somewhat in the nature of a rhetorical flourish; but when it is said that all men equally free have the inherent rights of life, liberty, and the pursuit of happiness, it is certain that it is not meant that some have or may have greater privileges before the law than others. The phrase must mean equality before the law, if it means anything.

The idea is expressed more happily in the fourteenth amendment, where it is said that no state shall deny to any person within its jurisdiction the "equal protection of the law." A tax law which makes unjust discrimination,—which taxes one person at one rate, and another one, within the same class and under like circumstances, at another rate, or exempts him altogether,— denies the equal protection of the laws. This must be self-evident. There may indeed be classification; and if the classification be founded upon real differences, affording rational grounds for a distinction, such classification will not violate the rule of uniformity and equality. So, also, there may be exemption, but the exemption must be reasonable in amount, and founded, also, on rational grounds.

These, then, are the vital questions in this case: (1) Is the exemption of all estates under $10,000 in value reasonable? And (2) is the attempted classification a legal and rational one? As to the exemption, we confess that, especially with regard to devises or transfers to strangers and collaterals, it seems very large. It is much larger than is allowed by

most of the inheritance laws in other states.    In New York
the exemption in such cases is only $500, while in case of
devises or transfers to lineal descendants and other near rela-
tives it is $10,000.    In most of the other state laws where
exemptions are allowed, they run from $250 to $1,000, but
in Massachusetts the exemption limit is fixed at $10,000, and
in Montana at $7,500.    Both of these last-named laws have
been sustained by the courts of last resort in the states respect-
ively, in which they were enacted, and in both cases the
question of exemption was raised and discussed.    *Minot v.
Winthrop,* 162 Mass. 113; *Gelsthorpe v. Furnell,* 20 Mont.
299.    In Massachusetts, it is true, there was no constitutional
provision of uniformity governing the tax, but in Montana
there is a constitutional provision requiring a uniform rate
of taxation.    In both cases cited, the exemption was sus-
tained on the ground that the cost of administration of small
estates is proportionately larger than that of large estates, and
that this operates to diminish the amounts received by bene-
ficiaries, and that it appears that such laws have usually
granted exemptions, and that the amount of exemption is
peculiarly a subject for the exercise of legislative discretion.
In our state the right to make reasonable exemptions in tax
laws has always been recognized, and, of course, the legisla-
ture must be the first judge as to the proper amount thereof.
No court will assume to say that the legislature is wrong in its
judgment as to the amount, unless such error appears so
clearly as to leave no reasonable doubt.    So, while we would
have been better pleased had the exemption been more nearly
in accord with the general rates of exemption as fixed in other
laws, we do not feel that we can say, in opposition to the
judgment of the legislature, that the amount fixed is unrea-
sonable.

Passing then to the question of classification, we reach
really the crucial point of the case.    We have endeavored
to give this subject the most careful thought and inves-

tigation, but we have been unable to convince ourselves that the attempted classification in this law answers the requirements of legal and constitutional classification. It is a trite expression that classification, in order to be legal, must be rational; it must be founded upon real differences of situation or condition, which bear a just and proper relation to the attempted classification, and reasonably justify a difference of rule. It is well settled that there may justly be classification between lineal descendants, collateral relatives, and strangers; each may be made a class and a different rule applied, because there are real differences of situation and in the considerations applicable to the various classes. It has been decided, also, that a progressive law which levies one rate of tax on all receiving over $10,000 and not exceeding $20,000, and a higher rate on all receiving over $20,000 and not over $50,000, and so on upwards, is a valid law, and that such classification does not violate the rule of equality, because the classes are proper classes, and all members of a given class are treated alike. *Magoun v. Ill. T. & S. Bank,* 170 U. S. 283.

This latter provision is not involved in the present case, as there is no such element in our law. But while classification is proper, there must always be uniformity within the class. If persons under the same circumstances and conditions are treated differently, there is arbitrary discrimination, and not classification.

It is claimed that such is the effect of the present law, and we can see no escape from the conclusion. People in the same class are subject to different rules, some being exempt and some being taxed. This results from the peculiar provisions of sec. 19 of the law, which defines "estate" and "property" as construed by the New York courts before we borrowed the law. As already pointed out, under this provision the $10,000 limitation or exemption is based on the size of the whole property devised or granted, and not upon

the amount received by each individual legatee or grantee. Thus it results that one collateral relative, receiving a legacy of $2,000 from one testator, whose estate amounts to but $9,500, pays no tax, while another collateral relative in the same degree, receiving a legacy of $2,000 from another testator whose estate amounts to $10,500, is obliged to pay a tax. Here is unlawful discrimination, pure and simple. No rational distinction or difference can be drawn between the two legatees simply because the estates from which their legacies come are of slightly different size. They are both within the same class, surrounded by the same conditions, and receiving the same benefits. One pays a tax, and the other does not. This is not the equal protection of the laws.

We have reached this conclusion reluctantly. We should far rather have sustained the law, but the conclusion has been forced upon us. We agree with the general principles which have been approved by the overwhelming weight of authority in the courts of this country with reference to inheritance or succession tax laws. Those principles are, in brief, that such taxes are taxes upon the right to receive property, and not upon property itself; that classification between lineals and collateral relatives and strangers does not violate the rule of uniformity, nor the principle of the equal protection of the laws; and that reasonable exemption of small estates also may be allowed without violating uniformity. We have been compelled to condemn the present law, notwithstanding the foregoing general conclusions in favor of the validity of such laws in general, because, under its peculiar provisions, unlawful discrimination necessarily results between beneficiaries in the same class.

We have not attempted to review the authorities in the various states, although the field is a broad and interesting one. Among the authorities which will be found to be of value in the consideration of the questions involved, the following may be named in addition to those already cited in this opin-

ion: *Scholey v. Rew,* 23 Wall. 331; *U. S. v. Perkins,* 163 U. S. 625; *Plummer v. Coler,* 178 U. S. 115; *Kochersperger v. Drake,* 167 Ill. 122; *State v. Alston,* 94 Tenn. 674; *In re Wilmerding's Estate,* 117 Cal. 281; *In re Stanford's Estate,* 126 Cal. 112; *Union T. Co. v. Durfee* (Mich.), 84 N. W. Rep. 1101; *State ex rel. Fath v. Henderson,* 160 Mo. 190; *State ex rel. Garth v. Switzler,* 143 Mo. 287; *State v. Ferris,* 53 Ohio St. 314; *Curry v. Spencer,* 61 N. H. 630; *Strode v. Comm.* 52 Pa. St. 181; *State v. Dalrymple,* 70 Md. 294; *Cope's Estate,* 191 Pa. St. 1.

The view we have taken of the constitutional question involved renders unnecessary the consideration of any other questions in the case.

*By the Court.*—Judgment reversed, and action remanded to the circuit court of Milwaukee county, with directions to that court to reverse the judgment of the county court and render judgment in accordance with this opinion.

CASSODAY, C. J. I fully concur in the opinion of my brother WINSLOW in this case. I add this note merely to avoid any misapprehension as to my relation to the case. Several months ago I had occasion to pay a small inheritance tax under the legislative enactment in question. I made such payment voluntarily and without any protest, and with no expectation that the same would be paid back,—without regard to the question whether the act was void or valid. I neither make nor have any claim for such repayment. Such being the facts, I participated in the hearing and the decision of the case.

MARSHALL, J. I join with my brethren in the decision in this case, but would be better satisfied if the court had considered and expressed an opinion upon the proposition urged by counsel for respondents in support of the judgment and challenged by counsel for appellants, that such legislation

as that in question, barring any discriminating features, can be supported upon the theory that there is unlimited legislative authority to appropriate to public ownership a proportion or the whole of a person's possessions upon the occasion of his death. The court was contented to express a doubt as to that. The prevalence of the contrary doctrine is such that a good degree of judicial courage was required to go even that far. However, having reached the region of doubt on a proposition so well maintained by the authorities, it were better, as it seems, in view of the dangerous character thereof, had the court judicially solved the doubt as to this jurisdiction, and if the decision were against the proposition, to have distinctly and vigorously repudiated it.

If, after the development of personal liberty for all the centuries that have preceded us and the embodiment in our constitutional system of the accumulated wisdom of those who have endeavored to so intrench its principles in a written, binding declaration, as to protect the citizen from assaults by what would otherwise be, even, absolute power to destroy, if it were so willed, to do with one's property or property rights whatever it might see fit, such system is still so inefficient that there is no limitation whatever upon sovereign authority to confiscate to public ownership private property in the event of the decease of the owner thereof, that it may take from him and from his natural successors one of the prime essentials to his and their "pursuit of happiness,"—then the fathers of the republic, state and national, have failed, most signally, in their efforts to construct a perfect system of government, able to give life to some of the fundamental principles included in their declared intention. As said in the opinion of the court, the idea seems to have first found significant lodgment in the decisions of American courts, that there is no constitutional limitation upon legislative power to convert private property upon the death of the owner, except that laws in that

regard shall bear equally upon all, in *Eyre v. Jacobs,* 14 Grat. 422. The pronouncement there made has been copied time and again into the decisions of other courts, those of the supreme court of the United States not being an exception. In no case, however, has the decisiÒn as to the validity of any law, or as to the right or wrong of any alleged cause of action, turned upon such doctrine. It has been used merely *arguendo,*—put forward as a reason with others, sufficient in themselves, to sustain the law in question and the judgment rendered.

In the initial case to which we have referred, as well as in the cases that followed, the right to have one's property pass in some way to a private successor or successors was spoken of as wholly a creature of the law, not in any sense a natural right or one having any constitutional protection. We cannot believe it to be possible that a privilege regarded in all civilized nations as one of the most valuable of individual possessions, that of transmitting in succession in the family relation, the accumulations of private energy, and of the successors in such relation to take, if deemed worthy by the owner of the property, should be considered in no sense a natural right, and to be without any constitutional protection; that, in the effort to put limitations upon legislative power, as to that one object, it was not safeguarded at all; that the lawmaking power here, as to that, is as absolute as the parliament of England; that it is "so absolute that it cannot be confined, either for persons or causes, within any bounds." Sir Edw. Coke, 4 Inst. 36. No such power could exist in any state in this Union upon any subject, it seems, except upon the occasion of a primary meeting to form a constitution, entirely unrestrained by the national constitution.

To limit the power of the people themselves, acting in a legislative capacity through their representatives, is one of the prime objects of a written constitution. Experience

shows that without such limitation the inherent rights of the people, for which the fathers battled and which they so signally vindicated, would not long withstand the assaults of the people themselves. In our judgment the right to inherit is one of those inherent rights. General language was used in the fundamental declaration of rights, which formed the basis for every constitutional declaration in that regard that followed and is found in the various state constitutions. It was designed to be broad enough to cover every principle of natural right, of abstract justice.

'All men are created equal. They are endowed by their Creator with certain unalienable rights. Among these are life, liberty and the pursuit of happiness. To secure these rights, governments are instituted among men, deriving their just powers from the consent of the governed.'

Our own constitutional declaration varies but little from that:

"All men are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted among men, deriving their just powers from the consent of the governed."

It seems that within those broad and comprehensive words is plainly lodged protection for the citizen as to every natural right and every principle of justice that is deemed essential to the consummation of the legitimate objects of human existence, including enjoyment, under proper regulations, of all the characteristics of the social instinct, to individual happiness, not elsewhere found protected in the constitution; that, rightly construed and applied, it ties the hand of legislative power in regard to dealing with the transmission of property by inheritance other than by reasonable regulations, including reasonable burdens to pay the costs of administering the law and the power of taxation, exercised without discrimination, upon the right to take by inheritance.

Can there be any reasonable doubt about what has been said, viewing the language of the declaration of rights from the standpoint of those who originated it? The very purpose they sought to accomplish was to put an end to legislative interferences with inherent rights,—those rights which it was supposed all men ought to be freely permitted to enjoy under reasonable regulations, and which concern the individual happiness of the members of a law-abiding community; those rights which the people, at the time of making such declaration, were in full possession of, one of which was the privilege to transmit property in succession. Who will venture to assert that the pursuit of happiness, in the constitutional sense, would not be seriously, most grievously interfered with, by taking away the inducement to exertion and the hope and expectation of transmitting the fruits thereof to others?

It is wrong to suppose that there is no constitutional restraint upon legislative interference with the right to transmit property by inheritance, because no express limitation in that regard can be found in the constitution, as seems to have been the view of the Virginia court in the initial treatment of the subject to which we have referred. That instrument would be found to be sadly insufficient in many respects if it were not given effect in spirit as well as in letter. Any legislation which clearly invades those general principles that are expressed within the scope of the language to which we have referred is as much inhibited by the constitution as if it were restrained by clear and unmistakable language, in the literal sense thereof. *People ex rel. O'Connell v. Turner,* 55 Ill. 280. In a note by Judge REDFIELD to that case, in 10 Am. L. Reg. (N. S.), 373, some doubt is, apparently, expressed as to whether there is "living power enough in those abstractions of the state constitutions, which have heretofore been regarded as mere 'glittering generalities,' to enable the courts to enforce them, against the enact-

ments of the legislature, and thus declare that all men are not only created free and equal, but remain so, and may enjoy life and pursue happiness in their own way, provided they do not interfere with the freedom of other men in the pursuit of the same objects." But that they may be successfully invoked to annul unreasonable legislative interferences which are inconsistent therewith, there can be no reasonable doubt. For a significant example of the force of that part of the constitution under discussion, we may point to the fact that the institution of African slavery was abolished in the state of Massachusetts by its constitutional declaration that "all men are created free and equal and have certain natural, essential, and unalienable rights;" and that it was there held that such declaration nullified all laws existing at the time it was adopted by the people, inconsistent therewith. 10 Bancroft, Hist. U. S. pp. 365, 366.

In discussing the scope of the term "liberty and the pursuit of happiness," Tiffany, Const. Law, §§ 28, 29, says, in effect, that the right to seek happiness implies the right to acquire and enjoy that upon which happiness depends and to enjoy it in a way to promote the most complete human contentment, to satisfy completely the physical needs, and those of the intellect and affection as well; that without such privileges there can be no perfect happiness, therefore the recognition of the right to seek happiness as inherent in all men, implies the right to seek all the essentials of happiness, to satisfy the natural longings of our human nature so far as that is consistent with a perfectly regulated social system.

The doctrine which I take issue with is a relic of feudalism, which not only cannot, in the nature of things, have any legitimate place in our constitutional system, but, in our judgment, is plainly rejected by the language of our state constitution, not only in the declaration of inherent rights to which we have referred, but by another to which we will now call attention. The old idea of our English ancestry

was that landed estates were not the subject of absolute private ownership; that the private possessor merely held such an estate under a species of tenure, requiring personal fealty to the "lord paramount" as a condition thereof; that upon the death of such possessor, if the property was permitted to pass on to his successor, such permission was by the grace of the paramount proprietor, and that the process of transmission involved, in theory at least, a resumption of full title by the paramount proprietor and a bestowal again of the qualified title upon the successor, imposing upon him as an incident of his right the burden of fealty to the lord paramount the same as that carried by the former private possessor. The law neither made a will for the deceased proprietor in case of his dying intestate, nor executed one if he died testate, as a mere agent or intermediary to assist in the transmission of the property. What was done in the name of the law was done as the sovereign exercise of proprietary right of property. Under such a system no natural or absolute right of property, with power to transmit it as an incident thereof, could be recognized. Sovereign authority, in dealing with the question of succession, as regards landed estates, in theory, dealt with public rights. Our separation from all governmental connection with that system, and its necessary incidents, involved a radical change as regards the power of arbitrary sovereign interference with those things that are deemed necessary to life, liberty and the pursuit of happiness, other than by reasonable regulations. Fealty to sovereign power, under our system, springs from citizenship, not from the ownership of property. There is no basis left for a public proprietary right in private property. The supposed sovereign paramount right to property, and notion that the possessor thereof was a mere conditional holder, with no absolute right to have the same pass on to a private successor under some reasonable regulation, is one of those relics of the past intended to be abrogated by

our constitutional system, as is evidenced by the care that was taken to declare in our state constitution that all lands shall be deemed allodial. Our own declaration on the subject, found in sec. 14, art. I, is similar to those in state constitutions generally. That is inconsistent with the theory that the state, upon the death of the owner of property, acts by, proprietary right of control in any sense in passing the title thereto along to a private successor. It is consistent only with absolute ownership of property, the ownership indicated in the ordinary muniments of title by language to the effect, expressed or implied, that the grantee is to hold the title thereto to himself, his heirs and assigns forever,— an absolute ownership, having as a necessary incident, the power, express or implied, under proper regulations, to name a successor, with the right of kindred to have such power exist, leaving for sovereign authority, as its legitimate function in case of intestacy, to make a will, so to speak, distributing the property of the deceased along the lines of his presumed intention as embodied in the statutes, providing for a continuance of private ownership in such cases. *Hammett v. Philadelphia,* 65 Pa. St. 146–153.

The subject to which this opinion is devoted would admit of very extensive treatment. It is not my purpose to do more at this time than to take issue, most decidedly, with the theory that the right to transmit property by inheritance, and the right of next of kin and the immediate members of one's family to take by inheritance, have no constitutional protection. If what I say shall have some influence to stay the further intrenchment of an error which, carried to the possibilities thereof, would entirely destroy what all value as one of their most sacred possessions, the writing of this short and very imperfect discussion of the subject will not have been in vain. It is significant that the bases of the error, from first to last, have been, the idea that the right to transmit property is in no sense a natural right, in viewing

the right to deal with the subject from the standpoint of sys-
tems of government entirely different from our own, and in
failing to apply, in testing legislative power, those implied
limitations expressed in the constitution by necessary infer-
ence.  True, under the English system there is not supposed
to be any natural, individual right to dispose of property by
will, or to have the same transmitted to a successor by in-
heritance—no right that is above sovereign control to take
it entirely away.  But there are no inherent rights under
that system that are entirely above sovereign power of in-
terference, as represented by the king in theory but exercised
in fact by parliament.  Parliament is as absolute there as
the people would be here, acting in their sovereign capacity,
in the absence of any constitutional limitation.  We deny
the proposition that the right to transmit property under
reasonable regulations is in no sense a natural right.  It is
such a right, and clearly one of the essentials to individual
happiness.  Unless that can be gainsaid, the doctrine we con-
tend against has no reasonable basis to stand upon.  A care-
ful reading of the best considered cases where the subject has
been treated will show, as before indicated, that the error
we contend against was used *arguendo,* without considerate
intention to state more than that the right to transmit prop-
erty *by will* is clearly a creature of the statute, and that it,
and the right to transmit property to a surviving alien, *at all,*
may be wholly taken away by legislative enactment.  That
was the doctrine announced by Chief Justice TANEY in
*Mager v. Grima,* 8 How. 490, and it seems to have been the
idea, in the main, of Justice BROWN, when he wrote the
opinion in *U. S. v. Perkins,* 163 U. S. 625, in saying:

"Though the general consent of the most enlightened na-
tions has, from the earliest historical period, recognized *a
natural right in children to inherit property of their parents,*
we know of no legal principle to prevent the legislature from

taking away or limiting the right of testamentary disposition or imposing such conditions on its exercise as it may deem conducive to public good."

My conclusions are that the species of legislation under discussion cannot be justified upon the ground that there is no natural right whatever to transmit property by inheritance; that the ownership of property does not in any sense rest on a conditional bestowal thereof in the first instance by sovereign authority, subject to sovereign resumption of ownership upon the death of the owner thereof if the sovereign so wills; that a succeeding private owner of property by inheritance does not come to the possession of the same in any sense as a beneficiary of a sovereign head. The absolute title of the constitution must necessarily be considered, I think, as a title by right absolute, as absolute as any right which is subject, as all are, to reasonable regulations, or having, as incidental thereto, not the mere privilege, but the right in some way to have the property pass to a private successor in case of the death of the owner and the right of kindred to have it so pass. We repeat what has been said: that is one of the prime essentials of the pursuit of happiness declared in the constitution to be an inherent possession of all men. Who could define the constitutional meaning of that term and leave out any of those things universally supposed to be necessary accompaniments of civilized society? The social instinct suggests at once that it must include, as incidental to the right to dwell together in the family relation, the right, not only to acquire and enjoy property in the physical sense, but to have the mental enjoyment of transmitting it to others in the family relation under such reasonable regulations as legislative wisdom may see fit to impose. A legislative appropriation, as by sovereign proprietary right upon the death of the owner thereof, is a clear invasion of the spirit of the constitution, and is inconsistent with all our notions of constitutional liberty. That does not mili-

tate at all against the power to reach and tax the right to take property by inheritance or to take the same as devisee or legatee. The taxing power as to such property rights, the same as any other, is so firmly established on principle and authority, and reasonable legislative efforts to that end are so praiseworthy, that no one will venture to question the right itself. It needs no support now, if it ever did, by the idea that there is a constitutional right, vested in sovereign authority, to confiscate property upon the death of the owner,—that death can make that which was before private property, public property.