NUNNEMACHER, Trustee, vs. THE STATE.

*May 14—June 21, 1906.*

*Inheritance taxes: Constitutional law: Inherent rights as to property: Taxation not limited to property: Uniformity in rule of taxation: Equal rights and equal protection of the laws: Discrimination between different classes of relatives, etc.: Reasonable exemptions: Progressive rates: Levy of taxes by legislature: Fixing value of inheritance: Imposing nonjudicial duties on court.*

1. The right to transmit property by descent or by will is an inherent right protected by the constitution and, though subject to reasonable regulation, cannot be wholly taken away or substantially impaired by the legislature.
2. Inheritance or succession taxes may be levied by the legislature in the exercise of the power of reasonable regulation and taxation of transfers of property.
3. Inheritance taxes are not taxes upon property, but upon the right to receive property.
4. Sec. 1, art. VIII, Const. (providing that "the rule of taxation shall be uniform, and taxes shall be levied upon such property as the legislature shall prescribe"), does not by implied exclu-

sion limit taxation to property taxation or prohibit the levying of excise taxes.

5. The rule, *expressio unius est exclusio alterius*, like all other mere rules of construction applied to ambiguous words, yields to proof of facts and circumstances which satisfactorily demonstrates that the meaning intended was different.

6. The proceedings of the constitutional convention, the decisions of this court, and the practical construction given to the taxing power of the government for more than fifty years concur to show that such power is not limited to property alone.

7. Taxation of railroads under ch. 74, Laws of 1854, and under the license system in use from 1860 to 1903, was not taxation of property within the meaning of sec. 1, art. VIII, Const., but was excise taxation upon the privilege of transacting business. So, also, the license fees exacted from other public service corporations whose property is exempted from taxation, and from domestic insurance companies, are privilege or· occupation taxes.

8. The clause in sec. 1, art. VIII, Const., "the rule of taxation shall be uniform," if applicable to excise taxation at all, means no more than the general equality clauses of the state constitution or the guaranty of "the equal protection of the laws" in the XIVth amendment to the federal constitution. It means only that such taxation shall not unjustly discriminate, but shall operate alike upon all persons similarly situated.

9. Classification between lineal and collateral relatives and strangers, with different rates, and a reasonable exemption of small estates, as provided for in the inheritance tax law of 1903 (ch. 44), do not violate the rule of uniformity or the principle of the equal protection of the laws; nor does the progressive feature of the act, by which increased rates are imposed as the amount of the bequest or inheritance increases.

10. Sec. 5, art. VIII, Const. (which declares that "the legislature shall provide for an annual tax sufficient to defray the estimated expenses of the state for each year; and whenever the expenses of any year shall exceed the income, the legislature shall provide for levying a tax for the ensuing year, sufficient, with other sources of income, to pay the deficiency as well as the estimated expenses of such ensuing year"), is intended merely as a regulation or provision covering the levy of a direct tax upon property, if ·such a tax be necessary, and does not apply to excise taxation.

11. That part of ch. 44, Laws of 1903, which provides that the county court, as an incident in the settlement of an estate, shall determine the value of the property inherited or bequeathed, as a

basis for ascertaining the amount of the tax as fixed by the law, does not impose nonjudicial or merely administrative duties upon the court.

DODGE, J., dissenting, is of the opinion that the requirement of sec. 1, art. VIII, Const., that "the rule of taxation shall be uniform," is applicable to all taxation, whether on property as a subject or, by excise, on occupations, transfers, and the like, classification of the subjects of taxation being permitted, provided uniformity in the class is maintained; that amount or value of property or right is not a legitimate distinction germane to a classification of it for varying rates of a tax or excise based on value; and that, even if the uniformity clause has no application to taxation by excise, yet the general equality clauses of the constitution prohibit such discrimination between individuals as is involved in the progressive feature of the act of 1903, under which the rate varies according to the magnitude of the bequest or inheritance.

CASSODAY, C. J., dissenting, is of the opinion that the act of 1903 imposes a tax upon property within the meaning of sec. 1, art. VIII, Const., and that the classification provided for in the act, founded upon mere differences in value, is purely arbitrary and in violation of the constitutional guaranty of equal rights.

ACTION commenced in this court against the state. *Complaint dismissed.*

The cause was first argued on December 18, 1905.

For the plaintiff there was a brief by *Ryan, Ogden & Bottum,* attorneys, and separate briefs by *Charles Quarles* and by *Alfred L. Cary,* of counsel, and the cause was argued orally by *Mr. Quarles* and *Mr. L. M. Ogden.* They contended that ch. 44, Laws of 1903, is void as being in violation of sec. 1, art. VIII, Const., and argued at length the following propositions: (1) The right to take property by will, intestate laws, or gift is a natural right, guaranteed by the constitution, and not one either derived from or which can be taken away by the legislature. (2) The act in question imposes a tax, not upon property, but upon the right or privilege of taking property in the various methods prescribed in the act. *Estate of Wilmerding,* 117 Cal. 281; *Estate of Stanford,* 26 Cal. 12; *Kochersperger v. Drake,* 167 Ill. 122; *State v. Hamlin,* 86 Me. 495; *In re Inheritance Tax,* 23

Colo. 492; *Union T. Co. v. Wayne Probate Judge,* 125 Mich. 487; *State ex rel. Fath v. Henderson,* 160 Mo. 190; *Gelsthorpe v. Furnell,* 20 Mont. 299; *Dixon v. Ricketts,* 26 Wash. 215, 72 Pac. 947; *State ex rel. Schwartz v. Ferris,* 53 Ohio St. 314, 41 N. E. 579; *Hagerty v. State ex rel.* 55 Ohio St. 613, 45 N. E. 1046; *Brown v. Elder,* 32 Colo. 527, 77 Pac. 853; *State ex rel. Sanderson v. Mann,* 76 Wis. 469; *Black v. State,* 113 Wis. 205, 222. (3) Sec. 1, art. VIII, Const., must be construed to limit the taxing power of the legislature to the imposition of taxes upon property only. The maxim *expressio unius est exclusio alterius* applies. *Milwaukee & M. R. Co. v. Waukesha Co.* 9 Wis. 399, 440 (argument of E. G. Ryan); *Wis. Cent. R. Co. v. Taylor Co.* 52 Wis. 37, 95; *State v. Gilman,* 33 W. Va. 146, 6 L. R. A. 847; *State ex rel. Morris v. Wrightson,* 56 N. J. Law, 126, 22 L. R. A. 548, 555; *People ex rel. Mooney v. Hutchinson,* 172 Ill. 486, 40 L. R. A. 770, 772; *Gougar v. Timberlake,* 148 Ind. 38, 37 L. R. A. 644, 650; *Ex parte Arnold,* 128 Mo. 256, 33 L. R. A. 386, 390; *Little Beaver Tp. Election: McCowin's App.* 165 Pa. St. 233, 27 L. R. A. 234, 235; *People v. Draper,* 15 N. Y. 532, 543, 544; *Spier v. Baker,* 120 Cal. 370, 41 L. R. A. 196, 199; *Parker v. Hughes,* 64 Kan. 216, 56 L. R. A. 275; Cooley, Const. Lim. (7th ed.) 99; *State ex rel. New Richmond v. Davidson,* 114 Wis. 563, 578. (4) Should the court be of the opinion that the legislature has the power to impose taxes upon rights or privileges other than property, the act in question is void for the reason that it violates the constitution, because it does not tax such rights by a uniform rule.

In the separate brief of *Mr. Quarles,* among other things, he considered more fully, as an historical question and otherwise, the doctrine that inheritance is a privilege; its justification; and the results which would flow from it.

*Mr. Cary,* in his separate brief, contended, *inter alia,* that, the main purpose of the act being to raise revenue for the state, its administration is of a legislative and not of a judi-

cial character. So far, therefore, as the act places the administration in the hands of the county court it is void, for such courts have not jurisdiction to perform legislative acts. Under the constitution of the state their duties are wholly judicial and not legislative. Secs. 2, 14, art. VII, Const.; *Hardenburgh v. Kidd,* 10 Cal. 402; *Hutchinson v. Omaha,* 52 Neb. 345, 351; *Auditor v. A., T. & S. F. R. Co.* 6 Kan. 500, 507; *Fleming v. Trowsdale,* 85 Fed. 189; *Pennington v. Woolfolk,* 79 Ky. 13; *Ex parte Griffiths,* 118 Ind. 183, 20 N. E. 513.

The *Attorney General,* for the defendant, cited, as authorities sustaining the theory upon which inheritance taxes are based, viz.: (1) that an inheritance tax is not one on property, but on the right of succession thereto; and (2) that the right to take property by devise or descent is the creature of the law, and not a natural right: *Mager v. Grima,* 8 How. 490; *Society for Savings v. Coite,* 6 Wall. 594; *Plummer v. Coler,* 178 U. S. 115; *Magoun v. Ill. T. & S. Bank,* 170 U. S. 283; *Blackstone v. Miller,* 188 U. S. 189; *Estate of Wilmerding,* 117 Cal. 281; *Estate of Stanford,* 126 Cal. 112; *In re Inheritance Tax,* 23 Colo. 492; *State v. Dalrymple,* 70 Md. 294; *Minot v. Winthrop,* 162 Mass. 113; *State ex rel. Fath v. Henderson,* 160 Mo. 190; *Gelsthorpe v. Furnell,* 20 Mont. 299; *Estate of Hoffman,* 143 N. Y. 327; *Estate of Van Kleeck,* 121 N. Y. 701; *Estate of Swift,* 137 N. Y. 83; *Estate of Dows,* 167 N. Y. 227; *Estate of Delano,* 176 N. Y. 486; *Pullen v. Comm'rs,* 66 N. C. 361; *State ex rel. Schwartz v. Ferris,* 53 Ohio St. 314; *Strode v. Comm.* 52 Pa. St. 181; *Orcutt's App.* 97 Pa. St. 179; *Estate of Bittinger,* 129 Pa. St. 338; *State v. Alston,* 94 Tenn. 674; *Eyre v. Jacob,* 14 Grat. 422; *Schoolfield's Ex'r v. Lynchburg,* 78 Va. 366; *Billings v. People,* 189 Ill. 472; *Kochersperger v. Drake,* 167 Ill. 122; *State v. Clark,* 30 Wash. 439; *Dixon v. Ricketts,* 26 Utah, 215, 72 Pac. 947. He also discussed fully the other contentions made on behalf of the plaintiff.

On January 30, 1906, a re-argument was ordered upon the following questions:

1. Is the tax imposed by ch. 44, Laws of 1903, a tax upon "property" within the meaning of the constitution?

2. Assuming that it is controlled by the constitutional requirement, "The rule of taxation shall be uniform," is that requirement breached either, *first,* by the imposition of rates of taxation varying with the degrees of propinquity between the decedent and the beneficiaries; or, *secondly,* by the imposition of progressive rates, varying according to the amounts of the legacies or inheritances received?

The cause was re-argued on May 14, 1906.

For the plaintiffs there were briefs by *Ryan, Ogden & Bottum,* attorneys, and separate briefs by *Charles Quarles* and by *Alfred L. Cary,* of counsel, and the cause was argued orally by *Mr. Quarles, Mr. L. M. Ogden,* and *Mr. E. C. Eastman.*

*R. M. Bashford,* special counsel, and the *Attorney General,* for the defendant.

WINSLOW, J.   This is an action commenced in this court under the provisions of sec. 3200, Stats. 1898, to recover from the state the amount of an inheritance tax paid under protest pursuant to an order of the county court of Waukesha county. The complaint is based upon the ground that ch. 44, Laws of 1903, under which the tax was levied and paid, is unconstitutional.   The attorney general interposed a general demurrer to the complaint, and thus the question of the constitutionality of the law is squarely presented.

A previous law attempting to tax inheritances and bequests (ch. 355, Laws of 1899) was before this court in the case of *Black v. State,* 113 Wis. 205, 89 N. W. 522, and was there held unconstitutional for the reason that it provided for unlawful discrimination, in that a beneficiary receiving a legacy or inheritance from an estate under $10,000 paid no tax,

while a beneficiary standing in exactly the same relation to the decedent and receiving a legacy or inheritance of the same amount from an estate exceeding $10,000 was obliged to pay a tax. In that case it was not contended that an inheritance or succession tax could not lawfully be levied in this state. In fact, the validity of such legislation, as a general proposition, was conceded; but the contention was that the law in question made unlawful discriminations and hence was void. From this concession it resulted that this court assumed, rather than decided, in that case that an inheritance tax law making no unlawful discrimination between heirs .or beneficiaries could be passed in this state which would be constitutional. It was doubtless in response to the suggestions of the opinion in that case that ch. 44, Laws of 1903, which is now attacked, was passed.

Sec. 1 of the last-named law provides in substance that a tax shall be imposed upon any transfer of property or interest in property, real, personal, or mixed, to any person, association, or corporation (except corporations organized solely for religious, charitable, or educational purposes), when made by will or by operation of the intestate laws, or by transfer made by the grantor or by another person under a power of appointment in contemplation of death, to take effect at or after the death of the grantor, which tax shall be based upon the clear market value of such property at the rates thereinafter prescribed, and only upon the excess over the exemptions thereinafter granted.

Sec. 2 provides that when the property or interest transferred exceeds the exemption and does not exceed $25,000 the tax shall be (1) one per cent. of the clear value where the person entitled to such property shall be the husband, wife, lineal issue, lineal ancestor of the decedent, or lawfully adopted or mutually recognized child of the decedent, or a descendant of such child; (2) one and one-half per cent. in case of the brother or sister of the decedent, or a descendant of such brother or sister, or the wife or widow of a son, or the

husband of a daughter, of the decedent; (3) three per cent. in case of the brother or sister of the father or mother of the decedent, or a descendant of such brother or sister; (4) four per cent. in case of the brother or sister of the grandfather or grandmother of the decedent, or a descendant of such brother or sister; (5) five per cent. in case of a beneficiary in any other degree of collateral consanguinity, or a stranger in blood, or a body politic or corporate. These rates are termed the primary rates.

Sec. 3 provides that when the value of the property exceeds $25,000 the rates of tax upon the excess shall be as follows: (1) Upon the excess over $25,000 up to $50,000, one and one-half times the primary rates; (2) from $50,000 to $100,000, two times; (3) from $100,000 to $500,000, two and one-half times; (4) upon all in excess of $500,000, three times the primary rates.

Sec. 4 provides for exemptions as follows: (1) All property transferred to domestic corporations organized solely for religious, charitable, or educational purposes and used exclusively for such purposes; (2) property of the value of $10,000 transferred to the widow, and property of the value of $2,000 transferred to each of the other persons named in the first division of sec. 2; (3) property of the value of $500 transferred to each of the persons named in the second division of sec. 2; (4) property of the value of $250 transferred to each of the persons named in the third division of sec. 2; (5) property of the value of $150 transferred to each of the persons named in the fourth division of sec. 2; and (6) property of the value of $100 transferred to each of the persons or corporations named in the fifth division of sec. 2.

The remaining sections contain full provisions for the administration of the law and the collection of the tax, which are not necessary to be stated here.

The constitutionality of this law, and of any similar law, is now attacked upon the following general grounds:

*First:* That the right to take property by inheritance or by

will is a natural right protected by the constitution, which cannot be wholly taken away or substantially impaired by the legislature.

*Second:* That the constitution of this state limits the power of taxation to property only, and that this tax is an excise levied upon a right or privilege, and hence unconstitutional.

*Third:* That even if the legislature has power, under the constitution, to levy such a tax, this law violates the constitutional requirement that the rule of taxation shall be uniform.

I. With the first of these propositions we agree. We are fully aware that the contrary proposition has been stated by the great majority of the courts of this country, including the supreme court of the United States. . The unanimity with which it is stated is perhaps only equaled by the paucity of reasoning by which it is supported. In its simplest form it is thus stated: "The right to take property by devise or descent is the creature of the law and not a natural right." *Magoun v. Ill. T. & S. Bank,* 170 U. S. 283, 18 Sup. Ct. 594. In *Eyre v. Jacob,* 14 Grat. 422, it is stated more sweepingly thus:

"It [the legislature] may tomorrow, if it pleases, absolutely repeal the statute of wills, and that of descents and distributions, and declare that, upon the death of a party, his property shall be applied to the payment of his debts and the residue appropriated to public uses."

But it has been reserved for the supreme court of North Carolina to sweep away all natural property rights in a few terse sentences, which may well be quoted:

"Property itself, as well as the succession to it, is the creature of positive law. The legislature declares what objects in nature may be held as property; it provides by what forms and on what conditions it may be transmitted from one person to another; it confines the right of inheriting to certain persons whom it defines heirs; and on the failure of such it takes the property to the state as an escheat. The right to

give or take property is not one of those natural and inalienable rights which are supposed to precede all government and which no government can rightfully impair." *Pullen v. Comm'rs,* 66 N. C. 361.

In this declaration the court of North Carolina seems to have easily reached the logical goal toward which the other cases only tend, namely, the denial of all natural rights of property. It comes perilously near the doctrine that might makes right,

> "The simple plan
> That they should take who have the power,
> And they should keep who can."

The fallacy of the idea that the government creates or withholds property rights at will is very apparent. Under our system the government is the creature of the people, the product of a social compact. The people, in full possession of liberty and property, come together and create a government to protect themselves, their liberty, and their property. The government which they create becomes their agent; the officers their servants. Under the theory of the North Carolina court these agents, in turn, create property rights and confer them upon their creators, who possessed these rights long before. The people create an agency to protect their existing rights which assumes to confer or withhold these same rights.

But the question is chiefly historical. From the historical standpoint the idea that all rights of property and rights to transmit the same by inheritance or will have their origin in the positive enactments of law by an established government cannot stand the test. Governments have, indeed, from the earliest times, regulated the exercise of these rights, prescribed ways and forms for their exercise, and protected them by positive law; and so they do now. From this universal exercise of the right of regulation the idea of governmental right to create and destroy may have arisen, but it seems more likely to have arisen from failure to keep in mind the radical difference between our republican theory of the origin of gov-

ernment and the European medieval theory. ⟩Our theory is that the people, in full possession of inalienable rights, form the government to protect those rights./ The medieval idea was that the government was sent down from above, and that from it rights and privileges were allowed to flow in gracious streams to the people, who otherwise would not possess them.

That there are inherent rights existing in the people prior to the making of any of our constitutions is a fact recognized and declared by the Declaration of Independence, and by substantially every state constitution.    Our own constitution says in its very first article:

"All men are born equally free and independent and have certain inherent rights; among these are life, liberty, and the pursuit of happiness; *to secure* these rights governments are instituted among men, deriving their just powers from the consent of the governed."

Notice the language, "to secure these [inherent] rights governments are instituted;" not to manufacture new rights or to confer them on its citizens, but to conserve and secure to its citizens the exercise of pre-existing rights.    It is true that the inherent rights here referred to are not defined but are included under the very general terms of "life, liberty, and the pursuit of happiness."    It is relatively easy to define "life and liberty," but it is apparent that the term "pursuit of happiness" is a very comprehensive expression which covers a broad field.    Unquestionably this expression covers the idea of the acquisition of private property; not that the possession of property is the supreme good, but that there is planted in the breast of every person the desire to possess something useful or something pleasing which will serve to render life enjoyable, which shall be his very own, and which he may dispose of as he chooses, or leave to his children or his dependents at his decease.    To deny that there is such universal desire, or to deny that the fulfilment of this desire contributes in a large degree to the attainment of human happi-

ness, is to deny a fact as patent as the shining of the sun at noonday. And so we find that, however far we penetrate into the history of the remote past, this idea of the acquisition and undisturbed possession of private property has been the controlling idea of the race, the supposed goal of earthly happiness. From this idea has sprung every industry, to preserve it governments have been formed, and its development has been coincident with the development of civilization. And so we also find that from the very earliest times men have been acquiring property, protecting it by their own strong arm if necessary, and leaving it for the enjoyment of their descendants; and we find also that the right of the descendants, or some of them, to succeed to the ownership has been recognized from the dawn of human history. The birthright of the firstborn existed long before Esau sold his right to the wily Jacob, and the Mosaic law fairly bristles with provisions recognizing the right of inheritance as then long existing, and regulating its details. The most ancient known codes recognize it as a right already existing, and Justice BROWN was clearly right when he said, in *U. S. v. Perkins,* 163 U. S. 625, 16 Sup. Ct. 1073:

. "The general consent of the most enlightened nations has from the earliest historical period recognized a natural right in children to inherit the property of their parents."

The existence of the right to dispose of property by will in the earliest times is not so easy of proof. Nevertheless it seems there can be no doubt of the fact. The biblical writings show the exercise of the right from the times of Abraham, and Mr. Schouler in his work on Wills (2d ed.) § 13, says that history "confirms the opinion that the practice of allowing the owner of property to direct its destination after his death, or at least of imposing general rules of inheritance, is coeval with civilization itself, and so close, in fact, upon the origin of property and property rights as not to be essentially separated in point of antiquity." The laws of Solon allowed

the willing of personal property in Athens, and the laws of
the Twelve Tables in Rome. In England the right of testa-
mentary disposition of personal and real property, or at least
a part of it, was recognized from the very earliest times, but
lands could not be willed after the Norman invasion and the
establishment of feudal tenures until Stat. 32 Henry VIII,
ch. 1, §§ 1–5. Cassoday, Wills, § 31 *et seq.;* 30 Am. & Eng.
Ency. of Law (2d ed.) 549.

So clear does it seem to us from the historical point of view
that the right to take property by inheritance or will has ex-
isted in some form among civilized nations from the time
when the memory of man runneth not to the contrary, and so
conclusive seems the argument that these rights are a part of
the inherent rights which governments, under our conception,
are established to conserve, that we feel entirely justified in
rejecting the *dictum* so frequently asserted by such a vast
array of courts that these rights are purely statutory and may
be wholly taken away by the legislature.

It is true that these rights are subject to reasonable regu-
lation by the legislature; lines of descent may be prescribed,
the persons who can take as heirs or devisees may be limited,
collateral relatives may doubtless be included or cut off, the
manner of the execution of wills may be prescribed, and there
may be much room for legislative action in determining how
much property shall be exempted entirely from the power to
will, so that dependents may not be entirely cut off. These
are all matters within the field of regulation. The fact that
these powers exist and have been universally exercised affords
no ground for claiming that the legislature may abolish both
inheritances and wills, turn every fee-simple title into a mere
estate for life, and thus, in effect, confiscate the property of
the people once every generation.

But, while we utterly reject the doctrine of *Eyre v. Jacob,*
14 Grat. 422, and hold that the right to demand that prop-
erty pass by inheritance or will is an inherent right subject.

only to reasonable regulation by the legislature, we are not thereby brought to the conclusion that inheritance or succession taxes cannot be levied. They do not depend upon the right to confiscate. We agree entirely with the ideas expressed by the supreme court of Massachusetts in *Minot v. Winthrop,* 162 Mass. 113, 38 N. E. 512, where it is said:

"We assume that under the constitution this (*i. e.* the taking of all property by the state on the death of the owner) cannot be done either directly or indirectly; that the legislature cannot so far restrict the right to transmit property by will or by descent as to amount to an appropriation of property generally; that it cannot impose a tax which shall be equivalent or almost equivalent to the value of the property, and cannot so limit the persons who can take as heirs, devisees, distributees, or legatees that the great mass of all the property of the inhabitants must become vested in the commonwealth by escheat. The state can take property by taxation only for the public service, and we assume that its right to take property, if any exists, by regulating the distribution of it on the death of the owner is limited in the same manner, and that this right must be exercised in a reasonable way."

Inheritance or succession taxes are very ancient and are said to have had their origin in the Roman law. They have long been in force in the European states, and in England and her colonies, where they are known as "death duties." They may be fully justified under the power of regulation and taxation of transfers of property. No one doubts for a moment that a government may levy a tax upon transfers of land or upon business transactions; it is done by the federal government in this country whenever additional and extraordinary revenues are needed, in the form of stamp duties. These taxes are not based upon the power to interdict or prohibit such transactions, but upon the power to reasonably regulate and tax them. Succession or inheritance taxes may well be sustained upon the same principle; not upon the power to prohibit, but upon the power to reasonably regulate and tax. This power existed when our state government was formed.

It entered into and modified the inherent right to possess, transmit, and will property, at the time the constitution was adopted, so that the inherent right recognized and preserved by the constitution was and is a right subject to reasonable regulation and taxation.

So we arrive at the conclusion that the general principle of inheritance taxation may be justified under the power of reasonable regulation and taxation of transfers of property, and we pass to the second contention.

II. This contention is that by sec. 1 of art. VIII of the constitution taxes can only be levied on property. This provision is the only general provision of the constitution upon the subject and reads as follows: "The rule of taxation shall be uniform, and taxes shall be levied upon such property as the legislature shall prescribe." The argument is that this provision, by the rule of *expressio unius est exclusio alterius,* prohibits the levy of any taxes in this state except taxes upon property, and that as inheritance taxes are held to be excise taxes upon the right to take property and not taxes upon property they cannot be levied in this state. It must be admitted that, by the absolutely uniform current of decision in this country, inheritance taxes are not taxes upon property, but upon the right to receive property. It would not be useful to cite the cases which hold this doctrine; they will be found quite fully cited and tabulated in 27 Am. & Eng. Ency. of Law. (2d ed.) 338, note 5. This court has announced the same doctrine in *State ex rel. Sanderson v. Mann,* 76 Wis. 469, 45 N. W. 526, 46 N. W. 51, and *Black v. State,* 113 Wis. 205, 89 N. W. 522, and it cannot be considered as open to doubt. So we meet the question whether any taxes other than taxes upon property can be constitutionally levied in Wisconsin. It seems strange that, notwithstanding the lapse of nearly three score years since the adoption of the constitution, this question has never been authoritatively decided in Wisconsin, yet such is the undoubted fact. The

clause has been considered and the question approached in numerous cases. Laws imposing license taxes upon hawkers and peddlers, upon the keeping of dogs, the sale of liquors, and upon insurance agents and insurance companies have been sustained under the police power. *Morrill v. State,* 38 Wis. 428; *Tenney v. Lenz,* 16 Wis. 566; *State ex rel. Henshall v. Ludington,* 33 Wis. 107; *Fire Department v. Helfenstein,* 16 Wis. 136; *Travelers' Ins. Co. v. Fricke,* 99 Wis. 367, 74 N. W. 372, 78 N. W. 407. Poll taxes for highway repair purposes have been uniformly levied and never questioned, but these also may perhaps be sustained under the police power. 1 Cooley, Taxation (3d ed.) 16. Railroad license taxation has been sustained upon grounds more fully considered later. In the course of the discussion upon this latter form of taxation in *Wis. Cent. R. Co. v. Taylor Co.* 52 Wis. 37, 8 N. W. 833, it was said on page 95 (8 N. W. 855): "Accordingly taxes can only be levied upon such property as the legislature shall prescribe, and then only by a uniform rule;" but the question at issue in that case was simply a question of exemption of property from taxation, and the sentence quoted unquestionably referred to property taxation and was not intended to lay down the principle that property taxation was the only taxation possible under the constitution. In *Black v. State,* 113 Wis. 205, 89 N. W. 522, as we have seen, it was assumed by reason of the admission of counsel that inheritance taxes might legally be levied in this state, and hence the statement in *State v. Whitcom,* 122 Wis. 110, 99 N. W. 468, that the question whether taxes other than taxes upon property are forbidden by our constitution was one not then authoritatively decided is strictly correct. The most that can be said is that there are intimations in both directions, and that the intimations that taxation upon anything except property is forbidden are the more numerous.

In approaching the question we start with the familiar proposition that the legislature has all the usual and neces-

·sary governmental powers, including the power to levy taxes upon occupations, privileges, franchises, and the like, as well as upon property, unless such power has been taken away by the constitution. There are no express words in the constitution limiting taxation to property taxation, but the question is whether sec. 1 of art. VIII, above quoted, has the effect of such a limitation under the familiar rule of construction, *expressio unius est exclusio alterius*. If we were compelled to decide this question upon the bare words themselves, without the help of the debates occurring in the constitutional convention when this section was formulated, and without the help of subsequent practical construction, the argument would be strong in favor of the plaintiff's contention. But we have a brief record of the constitutional debates, and we have fifty years of practical construction since the adoption of the constitution, and both must be considered.

Turning to the printed journal of the second constitutional convention, we find on page 113 that the committee on general provisions, of which Byron Kilbourn was chairman, on December 30, 1847, reported to the convention the article on "Finance," of which the first two sections were as follows:

"(1) All taxes levied in this state shall be as nearly equal as may be.

"(2) The property of the state and counties, both real and personal, and such property as the legislature shall deem proper, belonging to educational, charitable, or religious institutions, or set apart for such purposes, shall be exempted from taxation."

This article was taken up and considered in committee of the whole at the afternoon session on January 4, 1848, and Mr. Whiton moved to amend by striking out the whole of ·sec. 2, and made some remarks in support of the motion. (It appears by the preface that Mr. Whiton requested that his remarks be not reported, so we unfortunately are deprived of the aid which might well be expected from the remarks of

that eminent lawyer and statesman, who was afterwards chief justice of this court.)	The journal then proceeds as follows (p. 195):

"Mr. Kilbourn said this subject had been elaborately dis-·cussed in the committee, and they had arrived at the conclusion expressed in the article.	The attention of the committee had been called to the subject by one of its members, and the question raised whether it was necessary to declare that the property of the state should not be taxed.	It was evident that the state could derive no advantage from taxing its own ·property; but the counties might derive a revenue by taxing ·the property of the state.	For instance, the county of Dane might levy a tax upon the capitol, if no such prohibition as was contained in this section existed.	The first section provided that all taxes within the state should be as nearly equal as may be.	This provision would require that all the prop-·erty in the state should be taxed equally, not the property of A., B., and C. merely, but all the property in the state, which would include the property of the state, and without the restriction in the second section it was supposed that the legislature could not restrict the counties from taxing it.

"Mr. Whiton modified his motion so as to amend the sec-·tion by exempting the property of counties; which amendment prevailed.

"Mr. Rountree offered an amendment as a new section providing that all taxes should be by assessment of the value of ·the property taxed, excepting pedlars, hawkers, ferries, etc., and giving the legislature power to tax those separately.

"Mr. Kilbourn would like to hear some reasons from the gentleman from Grant, in favor of the section he had proposed.	It seemed to him very much like entering into the ·details of legislation.	If they were to specify the kinds of property to be taxed and the precise mode of taxation, they should begin with real estate and go through with an enumeration of every species of property to be taxed and the mode ·of taxing it.	He thought the first section was sufficient upon that subject.	It was simple and concise, and covered the whole ground.

"Mr. Rountree thought the first section did not cover the whole ground.	He wished to have the legislature bound by

some rules which would secure equal taxation, some rules which would require that taxation should be based upon some fair valuation of the property taxed, and not left to tax property coming under the same general denomination equally, while the value might be very different.     He considered it a matter of very great importance.     Our present laws did not secure a just and equitable valuation of property as the rule of taxation, and it was this kind of partiality and favoritism extended to particular kinds of property which he wished to see prohibited by the constitution.     If gentlemen expected to get a good constitution without having anything in it, they would find themselves mistaken in the end.     He wanted a constitution which common people could understand, and not one which no one could understand without going to a lawyer, or to those who made it a business to tell them what it meant.

"Mr. Chase could not see for his life what force or effect the section would have if placed in the constitution, for the legislature would have the same power without it as with it. He agreed with the gentleman from Grant that the value of the property should be the basis of taxation, but it seemed to him that the gentleman was going against his own principle in providing for the taxation of pedlars, hawkers, and jugglers, for he could not understand what kind of property they were.     He thought they could not be regarded as things of much value, and for his own part he considered them rather as nuisances than otherwise.

"Mr. Doran moved to amend section second so as to exempt from taxation the property of towns, cities, and the wards of cities.

"Mr. Lovell suggested to the gentleman from Milwaukee a modification of his amendment so as to exempt generally the property of municipal corporations.

"Mr. Doran declined so to modify his motion.     The terms 'municipal corporations' applied only to corporations possessed of legislative powers, and did not cover the ground which he wished to cover.     He wished the exemption to apply to bodies corporate, which were not always municipal corporations.     The several wards in the city of Milwaukee possessed separate property which he thought should be exempted from taxation, and yet they were not, in themselves, municipal corporations.

"Mr. Chase would inquire for what purposes those wards held their separate property. If held for educational purposes, it was already exempted by the section with all other property held for the same purpose. If it were held for charitable purposes, it was already exempted with all other property held for the same purpose. If it were held for any purpose for which it ought to be exempted, it was already exempted by the general provisions for that purpose, and if it were held for purposes of speculation it ought to be taxed.

"Mr. Kilbourn explained that the several wards own fire engines and engine houses, public grounds, markets, and market houses, which, although not devoted to either charitable or educational purposes, were public property, and should be exempt from taxation.

"The amendment was adopted.

"Mr. Whiton moved to amend the first section by adding the words 'and shall be levied upon such property as the legislature shall prescribe.'

"Mr. Chase said the amendment proposed by the gentleman from Rock would improve the section, but it would improve it still more if he would include in his amendment a proposition to strike out the words 'may be,' in the first line, and insert the word 'practicable,' so that it would read 'all taxes in this state shall be as nearly equal as *practicable.*' The words 'may be' covered all sorts of amendments, and, as they stood in the section, they had no meaning at all. The section might as well have read, 'All taxes in this state *may be* as nearly equal as they *shall be.*' They *shall be* as they *may be,* or they *may be* as they *shall be,* and this was all the sense there was attached to the words.

"Mr. Whiton's amendment was adopted, when

"Mr. Chase moved the amendment of which he had just spoken, and it was adopted.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Mr. Cotton moved to strike out the second section.

"Mr. Judd would like to have some reason for striking out the section after all the trouble they had had in amending it. He read the several provisions it contained and commented briefly on the importance of each. He approved of every one of its provisions, and hoped it would not be stricken out.

"Mr. Kilbourn thought the section could do no harm and

might do some good. It recognized the principle which the legislature should adhere to in exempting property from taxation. If stricken out, the very history of that fact might be construed as discountenancing the principle.

"Mr. Lovell hoped the section would be stricken out for the reason that it did no good, for he believed that, in an instrument of this nature, whatever did no good must necessarily do harm. If it did no other harm, it would embarrass the discretion conferred upon the legislature by the first section as amended.

"The motion to strike out was agreed to.

"Mr. Whiton moved to strike out the first line of the first section to the word 'practicable,' inclusive, and insert

" 'The rule of taxation shall be uniform throughout this state.'

"Which was adopted.

"Mr. Doran moved to insert a section as section second, providing that the property of the state, and of counties, towns, cities, and wards of cities, and all property held for educational or charitable purposes, should be exempt from taxation.

"Mr. Chase thought this the same section in substance as the one stricken out.

"Mr. Doran said the gentleman from Fond du Lac was mistaken. The section stricken out allowed the legislature a discretionary power, while the section he had proposed was imperative in respect to property devoted to educational or charitable purposes.

"Mr. Chase was still more convinced of the impropriety of adopting this section. Who was to determine what was a charitable purpose and what was not? He might regard some objects as charitable objects, in respect to which but very few members of the convention would agree with him. Again, if they attempted to specify in the constitution what kinds of property should be exempt from taxation, they should make the specification complete and enumerate every kind of property which should be exempt.

"Mr. Lovell wished to state an objection to the proposed section which he did not recollect to have heard alluded to in the course of the debate. Such were the established rules of construction with reference to constitutional provisions, that,

if the constitution made certain exemptions, it would operate as a prohibition upon the legislature to make any other or further exemptions. If, therefore, the proposed section should be adopted, it would make an end of all legislation on that subject. The legislature would have no power to exempt any other property from taxation, whatever might be the necessity for and propriety of such exemption.

"The amendment was rejected, and the article laid aside to be reported. . . ."

It is somewhat singular that the amendment or new section offered by Mr. Rountree in place of sec. 2 was not inserted in full in the journal. It appears in full in the account of the proceedings published in the Wisconsin Democrat of January 5, 1848, doubtless prepared by one of the same reporters, and is as follows:

"Sec. 2. The legislature shall provide for levying a tax by valuation, so that every person and corporation shall pay a tax in proportion to the value of his or her property, such value to be ascertained by some person or persons to be selected in such manner as the legislature shall provide by law, but the legislature shall have power to tax peddlers, auctioneers, brokers, hawkers, merchants, commission merchants, showmen, jugglers, innkeepers, grocery keepers, toll bridges and ferries, and persons using and exercising franchises and privileges, in such manner as they shall from time to time prescribe by law."

It further appears from the journal, on page 202, that the report of the committee of the whole upon the article on Finance was taken up by the convention on January 5th, and the following proceedings were had:

"No. 10. Article on 'Finance;'

"Was then taken up,

"And, the question being on concurring in the first amendment of the committee of the whole, which was, 'strike out the first section,' and in lieu thereof as follows:

" 'The rule of taxation shall be uniform throughout this state, and taxes shall be levied upon such property as the legislature shall prescribe.'

"Mr. Judd moved to amend the amendment by inserting the following as sections 1 and 2:

" 'Sec. 1. All taxes levied in this state shall be uniform and equal; and shall be assessed upon a just valuation of real and personal property.

" 'Sec. 2. The property of the state, property of any common school, university, college, or seminary of learning, all houses erected for and dedicated to the public worship of God, and the lots which they necessarily occupy for such purpose, and all public burying grounds and such other property as the legislature shall prescribe by law, shall be free from taxation.'

"And the question being put upon the adoption of the same,

"It was decided in the negative.

"The first amendment of the committee was then concurred in."

Upon page 205 of the journal it appears that Mr. Judd again moved to amend the article by inserting the following as sec. 2:

"The property of the state, property of any common school, university, college, or seminary of learning, all houses erected for and dedicated to the public worship of God, and the lots which they necessarily occupy for such purpose, and such other property as the legislature shall prescribe by law, shall be free from taxation."

This motion was followed by a debate upon the advisability of naming specific exemptions, participated in by Messrs. Chase, Lovell, Richardson, Kilbourn, Whiton, and Judd, and the motion was rejected by a vote of 42 to 17.

It appears, by the newspaper report contained in the newspaper before mentioned, that Mr. Richardson also proposed to amend by striking out the section reported by the committee and inserting the following:

"Sec. 1. All taxes to be levied in this state shall be levied upon all property, both real and personal, according to valuation.

"Sec. 2. Property belonging to the state, educational, charitable or religious institutions, or set apart for such purposes,

and such other property as the legislature shall deem proper, shall be exempted from taxation, anything contained in the first section of this article to the contrary notwithstanding."

But the amendment was rejected.

It further appears from the newspaper report that Mr. Vanderpool proposed the following as sec. 2:

"The legislature shall determine by law what property shall be exempt from taxation, and all other property, both real and personal, shall be taxed according to its valuation."

But the amendment was ruled out of order. Neither of these last two proposed amendments is mentioned in the journal. The article was then ordered to be engrossed.

It further appears by the journal, on pages 465 and 466, that the committee on revision and arrangement recommended to strike from sec. 1 the words "throughout the state," which was agreed to, and the section was finally incorporated in the constitution as it now stands, viz., "The rule of taxation shall be uniform, and taxes shall be levied on such property as the legislature shall prescribe."

Examination of this brief record brings out several rather remarkable facts: First, the debate in the committee of the whole upon this very important clause of the constitution, and as a result of which its terms were settled, occupied only a part of a single half-day's session; second, that debate, as well as the short debate which occurred on the following day on the floor of the convention upon Mr. Judd's amendment, was devoted wholly to the question of the exemption of property from taxation and the relative advisability of specifying in the constitution what property should be exempt, or of leaving the whole subject to the legislature in a general phrase; third, Mr. Rountree's amendment providing specially for the taxation of occupations and franchises was rejected, not for the reason that it was desired to deny the legislature power to levy such taxes, but because, as expressed by Mr. Kilbourn, it was going into the details of legislation, and, as

expressed by Mr. Chase, the legislature would have the same
power without it as with it, and to these views there was no
dissent; fourth, if by this clause the legislature intended to
limit taxation to property alone they did so without debate
and apparently without a word upon the subject either *pro* or
*con.*

There were eminent lawyers in that convention. Mr. Lov-
ell and Mr. Whiton were the peers of any in the territory
at that time, even if we could name no others. They knew,
and undoubtedly many others knew, that excise taxation was
a valuable and widely used form of the taxing power; yet if
we adopt the view contended for by the plaintiff we must say
that they deliberately deprived the state of this most effective
and useful arm of the taxing power after a debate of an hour
or two devoted solely to the subject of exemptions from prop-
erty taxation. This conclusion is startling, to say the least.
It can only be reached by arbitrary application of the rule of
*expressio unius,* and this rule, like all other mere rules of
construction applied to ambiguous words, yields to proof of
surrounding facts and circumstances which satisfactorily dem-
onstrates that the meaning intended by the parties was dif-
ferent.

But we are not dependent upon the proceedings of the con-
vention alone in our effort to properly interpret this clause.
History has been made since then. Practical construction
has been given to the taxing power of the government for
more than half a century. Has the state confined itself to
property taxation, or has it levied excise taxes in addition?
This question brings us to the consideration of the true na-
ture of the railroad license taxation system, which was in use
in this state from 1860 to 1903, a history of which will be
found in the opinion in the case of *State v. Railway Cos.* 128
Wis. 449, 108 N. W. 594. The first attempt to tax railroads
was made by ch. 74, Laws of 1854, which provided for the
payment by railroads of one per cent. of their gross earnings

for the previous year in lieu of all taxes, and authorized a levy upon the property and franchises of the company and sale of the same in default of payment. The constitutionality of this act was attacked in the case of *Milwaukee & M. R. Co. v. Waukesha Co.* 9 Wis. 431, 449, in the year 1855. Judge HUBBELL, upon the circuit bench, upheld the law on the ground that the same provided, not for a tax, but for the payment of a bonus or compensation by the company for the exemption of its property from taxation. The case came to this court and was ably argued by E. G. Ryan for the appellants and Finch & Lynde for the respondent. The law was sustained, but unfortunately no formal opinion was written, and the case was not officially reported for some years. In 1859 the case of *Knowlton v. Rock Co.* 9 Wis. 410, came before this court, involving the question of the validity of a law requiring farming lands within the limits of a city to be taxed at a different rate from property within recorded plats, and it was held that property could not be so classified. Reference was made in the opinion to the case of *Milwaukee & M. R. Co. v. Waukesha Co., supra,* and the statement made that it was there determined that no question of the exercise of the taxing power was involved in it. At this time Judge DIXON was chief justice and Judges COLE and PAINE were associate justices, while in 1855 the bench was composed of Justices WHITON, SMITH, and COLE. Judge SMITH, however, was still the official reporter in 1859, and in reporting the *Knowlton Case, supra,* he inserted as a note a full report of the *Milwaukee & M. R. Co. Case,* with his memorandum of the decision in that case, which it appears was prepared at the time the case was decided with the idea that a formal opinion should be written later, which for some reason was never done. This report of the case appears at page 431 of the original edition of 9 Wis. (Vilas & Bryant ed. 399), and the memorandum appears on page 449 of the original edition. From this memorandum we learn (1) that it was

held that the act did not violate the clause requiring uniform taxation providing all railroad property is alike taxed or alike exempt; (2) that the court thought the law did not impose a tax *within the meaning of the constitutional provisions,* and hence was valid.

At the January term, 1860, however, the direct question again came up whether the railroad taxation law of 1854 was constitutional, in the case of *State ex rel. Att'y Gen. v. Winnebago L. & F. R. P. R. Co.* 11 Wis. 35, and it was held (Justice COLE dissenting) that it provided for a tax on property, and transgressed the rule of uniformity, and hence was unconstitutional. In this case reference was again made to the *Milwaukee & M. R. Co. Case,* "in which there was never any opinion written," and it was distinctly overruled against Judge COLE'S protest. In this case the opinion takes up and treats the claim that the exaction is a license fee and not a tax, and rejects it for various reasons, among which were that it was directly called a tax in the title of the act, that it provided for no license, that it did not pretend to grant any authority or privilege to do any act, and hence did not perform the functions of a license law. This decision was made at the January term, 1860, and evidently threw the financial systems of the state and municipalities into great disorder. The legislature at once passed chs. 173 and 174, Laws of 1860; the first-named chapter exempting all railroad property from taxation, and the last-named chapter providing for taxation of railroads by the license system. In these acts the attempt of the legislature to follow the suggestions of the court in the *Plank Road Case* (11 Wis. 35) and make a law which should, in fact, be a license law is very manifest. Every reason suggested in that case why the law of 1854 could not be considered a license law was observed, and an attempt made to obviate it. But the question would not down. It was presented again in *Kneeland v. Milwaukee,* 15 Wis. 454, in 1862, when the extent of the financial ruin and govern-

mental paralysis resulting from the holding in the *Plank Road Case* was evident on every hand. The court in this case, after affirming the *Plank Road Case* upon the first argument, entertained a motion for rehearing, and while Justices Dixon and Paine remained of the same opinion upon the merits they finally agreed in overruling their former decision and returning to the decision in the *Milwaukee & M. R. Co. Case,* on the ground of *stare decisis.* So the law was settled in this state that the act of 1854 was constitutional.

. The only thing that can be said to have remained doubtful was the question as to what ground or grounds the decision in the *Milwaukee & M. R. Co. Case* went on. According to Judge Smith's memorandum, the only contemporaneous written evidence which we have, it went upon two grounds: (1) That if a tax, it did not violate the rule of uniformity because all railroad property was treated alike, and (2) because the court did not deem it a tax within the constitutional provisions (*i. e.* sec. 1 of art. VIII of the constitution). This second proposition can only mean that it was not a tax upon property. According to Judge Cole it was *not* decided that the law did not impose a tax, but Justice Paine in the final opinion in the *Kneeland Case* treated this difference of opinion as, in fact, immaterial, and said that all that it was necessary to know was that it was held that, if it was a tax, it was no violation of the rule of uniformity, and that the law was held to be no violation of the constitution. It is not very surprising that Judge Cole's recollection should not agree with the written memorandum. Doubtless the discussion in the consultation room took a wide range, and all know how rare it is that two persons will remember a long conversation or consultation alike. Both versions may be practically harmonized on this theory, namely, that it was held not to amount to a property tax under sec. 1 of art. VIII of the constitution, as Judge Smith says, but *was* held to be an exercise of the inherent taxing power of the state. Judge

SMITH's memorandum nowhere negatives this theory, but rather tends to support it, while this also justifies Judge COLE's statement that it was not held that the law did not impose a tax. However this may be, it would seem that the· question is authoritatively settled in the case of *Wis. Cent.. R. Co. v. Taylor Co.* 52 Wis. 37, 8 N. W. 833, where it was held, after an historical review of the cases in an opinion by the present chief justice, that "the decision of this court in: the case of *Milwaukee & M. R. Co. v. Waukesha Co.* 9 Wis. 449, appears to be eminently sound *on all points involved,* and all contained in subsequent opinions *inconsistent there-with* is hereby disapproved." Just what is meant by "all points involved" may not be entirely certain, although it. would seem to refer to the points named in the memorandum of the decision made by Judge SMITH; but there can be little doubt as to what is meant by the phrase "all contained in subsequent opinions inconsistent therewith." The positions. which Justices DIXON and PAINE took in the *Plank Road* Case (11 Wis. 35) which were inconsistent with the *Milwaukee & M. R. Co. Case* and upon which the latter case was. overruled were that the railroad tax was a tax upon property,. and' that hence it was void because not uniform under sec. 1 of art. VIII, and these positions are certainly disapproved by the *Taylor County Case.* So we regard it as settled by· the necessary effect of the decisions named that the railroad tax legislation of 1854, and *a fortiori* the railroad license legislation of 1860 and of following years, while imposing a tax in the proper sense, did not impose a tax upon property within the meaning of sec. 1 of art. VIII of the constitution,. but was in fact excise taxation upon the privilege of trans-·acting business.

But were it conceded that this is not a correct deduction· from the decisions cited, and that the only thing settled by them is that the tax is constitutional on some ground not stated, it is impossible for us to see how railway license taxa-

tion, such as has been in force since the acts of 1860 up to the
year 1903, can, in any event, be logically held to be taxation
of property. The entire property of the railroad company
is exempted from taxation by specific provision of law. How
can it be said to be taxed when the law makes it exempt from
taxation? A railroad company might have much property
in this state, but if it chose at any time to cease to operate
its railroad, for any reason, it could not be compelled to pay
the license fee, because the fee is only exacted of a person or
company "operating" a railroad as a condition of the issu-
ance of a license giving it the privilege to operate its road for
the ensuing year. The license fee is paid for the privilege of
doing its business. It is strictly a privilege or occupation
tax. 2 Cooley, Taxation (3d ed.) ch. 18.

It is matter of history that this occupation or privilege
tax has been continuously levied by the state unchallenged
since the decision of the *Kneeland Case, supra,* up to the
passage of ch. 315, Laws of 1903, and that a very large part
of the revenues of the state have been derived therefrom.
But, not only this, the same system of taxation by license of
business and exemption of property has from time to time
been extended to other fields of taxation, until at the present
time the property of street railway companies, electric light
and power companies, telegraph companies, and telephone
companies is and has been for years exempt from taxation,
and they have been required to pay an occupation tax or fee,
under the license system, for the privilege of transacting their
business.

Furthermore, the whole system of licensing domestic in-
surance companies to transact their business, so far as it is
resorted to for the mere purpose of revenue (and it is very
evident from the large sums annually collected that revenue
as well as regulation is its object), must be justified, if justi-
fied at all, as an excise or occupation tax. In the case of for-
eign companies these license charges may be justified under

the police power and the right of the state to impose any conditions on foreign corporations before allowing them to do business in this state, as in *Travelers' Ins. Co. v. Fricke,* 99 Wis. 367, 74 N. W. 372, 78 N. W. 407, but in case of domestic corporations, where a license fee is exacted which manifestly greatly exceeds the cost of supervision or regulation of the business, the exaction must be justified, if justified at all, under the power of taxation. *Wisconsin Tel. Co. v. Milwaukee,* 126 Wis. 1, 104 N. W. 1009; Cooley, Const. Lim. (7th ed.) 713.

Thus it seems to us quite certain that the decisions of this court, as well as a half century's practical construction, reinforce the conclusion so strongly suggested by the constitutional debates, namely, that sec. 1 of art. VIII is a section governing the taxation of property alone, and not intended to prohibit the taxation of privileges or occupations; that it really means, as held in the *Taylor County Case* (52 Wis. 37) at page 92 (8 N. W. 854), "Taxes shall be levied upon such property as the legislature shall prescribe by a uniform rule," or "the rule of taxation shall be uniform upon such property as the legislature shall prescribe;" that, so far as the taxation of property is concerned, there can be no classification which will interfere with substantial and practical uniformity of rate (*Chicago & N. W. R. Co. v. State,* 128 Wis. 553, 108 N. W. 557), and that the clause "the rule of taxation shall be uniform," if applicable to excise taxation at all, means no more than the general equality clauses of the constitution, or "the equal protection of the laws" guaranteed by the XIVth amendment. Taxation of privileges and occupations manifestly cannot be uniform in the sense in which property taxation may be uniform. Property may be all reduced to its money value and a uniform rate levied upon it all; but when occupations, privileges, or property transfers are to be taxed there is no common ground upon which they can meet, no standard by which their relative value or worth

can be measured or compared; and hence uniformity of taxation or even equality of taxation, as applied to excise taxes, must necessarily mean taxation which does not discriminate, but which operates alike on all persons similarly situated. In other words, proper classification may be made and a different rate applied to each class.   1 Cooley, Taxation (3d ed.) 72, 73; *State v. Applegarth,* 81 Md. 293, 31 Atl. 961; Tiedeman, Lim. of Police Power, 282.

III. These considerations bring us to the third point of the argument, and, in fact, partly answer it, namely, the objection that the tax here in question violates the rule of uniformity.   That rule, as applied to excise taxation, meaning simply that there shall be no unjust discrimination, the sole remaining question under this contention is whether the present law violates the true principles of classification.   It was said in the *Black Case* (113 Wis. 205, 89 N. W. 522) that "classification between lineals and collateral relatives and strangers does not violate the rule of uniformity nor the principle of equal protection of the laws; and that reasonable exemption of small estates also may be allowed without violating uniformity."   While the admissions made by counsel in the *Black Case* tend to deprive this expression of weight as an authority, the arguments in the present case aided by our own investigations have convinced us that the conclusions are correct and sanctioned by the great weight of authority.   In order to justify classification there must, of course, be substantial and real differences of situation calling for or reasonably suggesting the necessity for different treatment.   That a wife or daughter deprived by death of the care and support of her natural protector stands in substantially a different position from a collateral relative, and that her situation justifies different treatment, goes almost without saying, and that a collateral relative stands in a substantially different position from a mere stranger seems reasonably clear, although in less degree.   The authorities are quite unanimous

in justifying substantially the classification which is embodied in the law, and the supreme court of the United States has approved of it in numerous decisions, notable among which is *Magoun v. Ill. T. & S. Bank,* 170 U. S. 283, 18 Sup. Ct. 594. In view of our construction of sec. 1, art. VIII, of our constitution, by which we hold that it applies simply to property taxation, the question seems to be free from reasonable doubt.

The progressive feature of the act involves greater difficulty. By this feature increased rates of taxation are imposed as the amount of the bequest increases. Thus, if one legatee receives $25,000 and another in the same degree of kinship receives $50,000, while they will both pay the same rate on $25,000, the second legatee will pay a higher rate on his second $25,000. It is said that this is rank discrimination, that there is no difference in situation justifying a difference in classification, and that classification of persons cannot be based on mere differences in ability to pay. If this question were an original one it would seem serious. It is somewhat persuasive to note that railroad license taxes have been levied upon the progressive plan, increasing as the earnings per mile increase, since 1876 without question, and that street railroads and electric lighting companies are now subject to a like progressive rate of taxation. Stats. 1898, secs. 1213, 1222*d*. This fact would not, of course, be conclusive. The question has, however, been met in other courts, and it has been held with substantial uniformity that the progressive feature does not violate the general guaranties of equality and equal protection of the laws contained in the various state constitutions and in the XIVth amendment to the constitution of the United States. *Magoun v. Ill. T. & S. Bank, supra; Knowlton v. Moore,* 178 U. S. 41, 20 Sup. Ct. 747; *Kochersperger v. Drake,* 167 Ill. 122, 47 N. E. 321. The decision of the supreme court of the United States as to the force of the XIVth amendment is necessarily conclusive, and as the general equality guaranties of our own constitution

are substantially the equivalent of the equal protection of the laws guaranteed by the XIVth amendment, we are content to follow the decisions of the United States supreme court, and hold that the progressive feature does not violate the constitution.

Two minor contentions are made which we deem untenable. The first is that the law imposes a state tax, and violates sec. 5 of art. VIII of the constitution, which declares that "the legislature shall provide for an annual tax sufficient to defray the expenses for each year, and whenever the expenses for any year shall exceed the income, the legislature shall provide for levying a tax for the ensuing year sufficient with *other sources of income* to pay the deficiency as well as the estimated expenses of such ensuing year." It seems sufficient to say with regard to this contention that the section relied upon expressly recognizes the fact that the state may have other sources of income aside from a direct tax upon property, and the section quoted is simply intended as a regulation or provision covering the levying of a direct tax upon property, if such a tax be necessary.

The second contention is that the act is unconstitutional because it commits certain matters concerning the administration of the law, such as the fixing of the value of the property inherited or bequeathed and the amount of the tax, to the county court, and these are said to be administrative, not judicial duties. The argument does not appeal to us. The law fixes the tax; the court, as an incident in the settlement of the estate, simply determines, in a judicial way, certain facts necessary to be ascertained to determine how much the tax fixed by law amounts to in a given case. These duties seem to us as judicial in their character, and very properly intrusted to the county court in which the estate is being administered.

*By the Court.*—The demurrer is sustained and judgment dismissing the complaint ordered, with $25 attorney's fees and necessary disbursements, to be taxed.

Nunnemacher v. State, 129 Wis. 190.

Marshall, J. (*concurring*).   I concur in all that is said in the opinion of the court written by my brother Winslow. I choose to add a few words, more by way of emphasis than for any other reason.

It should be cause for much gratification to all who appreciate the principles of constitutional liberty, now so signally vindicated, that, rising above the influence of mere precedent, the court has the courage to cut loose from a judicial error that has been almost universally proclaimed by the courts of this country for many years—again demonstrating that

> "Truth crushed to earth shall rise again;
> The eternal years of God are hers;
> But Error, wounded, writhes with pain,
> And dies among his worshippers."

As we face and try to measure the limitless significance and importance of the conception of that great change in civil government from the old order to the one under a written constitution, we are utterly unable to harmonize it with the idea, inconsiderately expressed at first, and followed, thereafter, without original thought upon the subject, as it seems, that the transmission and taking of property through inheritable blood or by will rests in sovereign grace and not in right, and that it is competent for the law-making power to abolish all regulations on the subject, leaving property, upon the circumstance of the death of the owner, liable to be seized upon and enjoyed by the first taker or to escheat to the people as a whole.   How that relic of a system recognizing a personal, earthly sovereign as the source of all power and opportunity to acquire and enjoy and transmit the fruits of individual energy, could have been regarded as the light to guide judicial footsteps under a system dignifying former so-called privileges or graces as rights, puzzles the mind.   True, it has been affirmed over and over again by judges and courts of the highest respectability.   Eminent jurists whose names are written high in the temple of judicial fame have stood spon-

sors for it.   But the greatest errors of the past have had the most distinguished supporters.   If it were true that error could be sanctified by mere weight of the number or ability of its advocates, and be given the character of infallible truth by the mere force of repetition, then the error that the constitutional guaranties do not reach the subject we are considering would have long ago taken such deep root that the most courageous could not have hoped to dislodge it. But such, as experience shows, is not the case.   Error, though often repeated, is error still, and because it is error it is mortal and must be swallowed up by immortality.   We may well hope that the position of this court, now taken, will mark a return movement to a better appreciation of the great change which the constitution made from a form of personal government, unrestrained, in the ultimate, except by the conscience of the sovereign, to a government by the people under the restraints of a written constitution setting up the standard necessary to life, liberty, and the pursuit of happiness; and creating a judicial system, independent of all other departments, with supreme power to guard that standard.

The very opening lines of the immortal Declaration mark one of the greatest changes wrought in human affairs.   It was not the mere expression of a sentiment; it was the declaration of a fundamental truth designed to stand for the future as the central object of civil government, and to be a test of the legitimacy of legislative action: "We hold these truths to be self-evident: that all men are created equal; that they are endowed by the Creator with certain unalienable rights; that among these are life, liberty, and the pursuit of happiness."

Upon that all the constitutions of the land, state and national, have been builded.   If there were any purpose at all in that declaration and the incorporation of it into all constitutions, it was to mark the beginning of a new era, one when those things regarded to be essential to human life, hu-

man liberty, and human happiness should no longer be legiti-
mately referred to as subjects of enjoyment by mere sover-
eign grace, but should have the dignity of absolute rights,
regulated by laws reasonably necessary to their preservation
and enjoyment; not subject to regulation beyond that bound-
ary and into the realms of destruction.

It was that conception of the constitution in the soul of
Daniel Webster, when in the last years of his life, looking
backward at the dangers successfully passed, and facing in
contemplation those yet to come, he said:

"I love the constitution of the country. I have a passion
for it, the only political passion that ever entered into my
breast; I cherish it day and night; I live on its healthful,
saving influences, and I trust never, *never*, NEVER to cease to
heed it till I go to the grave of my fathers. The constitution
of the United States! What is there on the whole earth;
what is there that so fills the imaginations of men under
heaven; what is there that the civilized, liberalized, liberty-
loving people of the world can look at, and do look at, so
much as that great and glorious instrument, held up to their
contemplation, blazing over the Western Hemisphere, and
darting its rays throughout the world, the constitution of the
United States of America!"

Facing that not overdrawn picture, who could fail to appre-
ciate that a radical change was wrought by our organic law,
or doubt but what included among those unalienable rights
so forcibly proclaimed and impliedly or expressly guaranteed
is that of complete enjoyment of personal acquisitions, sub-
ject only to reasonable regulation? Why turn aside and test
the dignity of individual possessions in that respect by the
very system which the change was designed to replace?

When I wrote the concurring opinion in *Black v. State,*
113 Wis. 205, 89 N. W. 522, proclaiming the doctrine, and
without disfavor by my brethren, which the court has now so
emphatically vindicated, I affirmed that the power to tax
the right to inherit and to take by will, as property or the rep-

resentative of property, and make all reasonable regulations of such rights, which include reasonable revenue measures, exists and may well be exercised. Doubtless that may be done in either of two ways, viz.: under sec. 1, art. VIII, and independently thereof, limited by equality clauses of the constitution, which prohibit unjustifiable discriminations and legislation destructive of the right. The latter method was well known when the change to the present system of government in this country occurred. There were regulations for the purpose of revenue, and, besides, there was the overshadowing power to withdraw the privilege entirely. The latter was abrogated when the privilege, so called, was given the dignity of a right. Power as to the former was not affected. It can be exercised, subject to constitutional limitations. When the legislation in that regard passes the boundary of regulation and becomes discriminatory, or burdensome because not a reasonable taxing measure and therefore confiscatory, it meets the bar of the constitution. Further liberty than that to deal with property rights on the occasion of the death of an owner is a relic of the past. It has no legitimate place in our system of constitutional liberty.

DODGE, J. (*dissenting*). I find myself unable to yield assent to the conclusion of the court in this case that the legislature has not transgressed the limitations clearly imposed by the constitution upon the powers delegated to that branch of the government. With several of the steps of reasoning declared as leading to that conclusion I have no quarrel. Thus, I do not doubt that the general grant of legislative power includes authority to lay taxes upon substantially all subjects, at least all subjects commonly recognized in 1848 as customary and proper. Among such subjects were transfers of property, prosecution of business of all kinds, and, indeed, the exercise of any rights or privileges. Neither can I avoid the conclusion that this general power to lay

taxes is not limited to property as the only subject by the clause in sec. 1, art. VIII: "Taxes shall be levied upon such property as the legislature shall prescribe." I am convinced, after much consideration of the constitutional debates, that such clause was inserted merely to declare authority in the legislature to exempt some property and to tax some. I am also clear that among the transactions recognized as legitimate subjects of taxation by imposition of an excise tax, duty, or impost is the transmission of property, upon death of its owner, to his descendants or legatees. Whether such transmission rests on inherent right such as the government cannot take away, or upon a mere privilege which the legislature might accord or deny, in its discretion, as so generally asserted by high authority both legal and economic, I deem a wholly academic question here. If the former, the transfer, like other transfers of property, is a customary and proper subject of taxation. If a mere privilege, resting in grant by the legislature, still that grant has been made, and a legal right of inheritance has been established, and the statute under consideration obviously provides merely for a tax upon a recognized and existing right, not for the revocation or denial of such right even in part.

After assenting to all these positions, however, I still find, in our constitution, limits upon the power of the legislature to lay even an excise tax upon transfers of property. Sec. 1, art. VIII, declares that the "rule of taxation shall be uniform." I can find nothing in the constitutional history to support the view that this behest applies only to some taxes and not to others. Its association in the same section with the clause above quoted authorizing the legislature to prescribe the property on which taxes shall be laid, and, inferentially, that which shall be exempt from taxation, does not to my mind even suggest that the uniformity clause has application merely to taxation of property. It must be remembered that this behest for uniformity, with slight difference

in form, was in the draft of the constitution as a separate
section, and was never the subject of serious question or de-
bate.   It is also obvious that the members of the convention
considered that the "taxes" or "taxation," contemplated as
within the power of the legislature, included taxation by
means of excise or duty upon occupations and privileges.
The discussion quoted in the court's opinion shows uniform
assumption of this fact.   The next section was obviously
framed originally in recognition of the necessity of some ex-
ception to this rule of uniformity, due to the fact that, in
application of the taxing power to property, some must be
exempt and some other ought to.   Federal property could
not be taxed; taxation of state or municipal property would
be absurd; while certain other classes, like ecclesiastical or
educational property, might wisely be omitted.   The discus-
sion resulted in a decision to confer on the legislature full
control over the subject of exempting property from taxation;
but there is no hint of any purpose to further narrow the re-
quirement that the legislature pursue a uniform rule in all
taxation, whether on property as a subject or, by excise, on
occupations, transfers, and the like.   Nor can I discover any
difficulty in practical application of such a requirement.
True, there can be no uniformity between an inheritance tax
and a peddlers' license tax, because there can be no compari-
son, but each can be laid by a uniform rule.   All the deci-
sions of this court support that view.   If, as now declared,
the railroad licenses were mere occupation taxes, it was cer-
tainly assumed, both in *Milwaukee & M. R. Co. v. Waukesha
Co.* 9 Wis. 431, and in *Wis. Cent. R. Co. v. Taylor Co.* 52
Wis. 37, 8 N. W. 833, that uniformity within the class was
required, and such necessity was decided as to peddlers' li-
censes if they must rest on the taxing power.   *State v. Whit-
com,* 122 Wis, 110, 118, 99 N. W. 468.   Again, the require-
ment of uniformity of rule has repeatedly been held to per-
mit classification of subjects of taxation provided uniformity

in the class is maintained (*Milwaukee & M. R. Co. v. Waukesha Co., supra; Wis. Cent. R. Co. v. Taylor Co., supra; Kingsley v. Merrill*, 122 Wis. 185, 99 N. W. 1044; *Black v. State*, 113 Wis. 205, 89 N. W. 522; *State v. Whitcom, supra*) ; also as to inheritance taxes in *State ex rel. Sanderson v. Mann*, 76 Wis. 469, 477, 45 N. W. 526, 46 N. W. 51, and *Black v. State, supra.* However, I do not consider the uniformity clause at all essential to my conclusions in this case.

Even if it has no application to taxation by excise, yet in sec. 1, art. I, of the constitution of Wisconsin we find limitation upon the powers delegated to the government which the people· created by that instrument:

"All men are born equally free and independent, and have· certain inherent rights; among these are life, liberty, and the pursuit of happiness; to secure these rights, governments·are instituted among men, deriving their just powers from the· consent of the governed."

This section, while in form merely declaratory of general principles, has been repeatedly held to so evince the conception of private and individual rights of the people of this· state which must be sacred against violation by the government which they consented should exist over them, that it declares a limitation upon the powers of that government. *State ex rel. Kellogg v. Currens*, 111 Wis. 431, 87 N. W. 561; *Black v. State*, 113 Wis. 205, 219, 89 N. W. 522; *State ex rel. Zillmer.v. Kreutzberg*, 114 Wis. 530, 90 N. W. 1098; *State v. Whitcom*, 122 Wis. 110, 118, 99 N. W. 468.   Indeed, the opinion filed on behalf of the court concedes, with the fairness which always characterizes its author, that this· section of our constitution requires this, like all laws, to be free from arbitrary discriminations for or against any persons or class of persons not distinguishable from others in respects germane to taxation.   In this first utterance of our· constitution is declared the keynote and dominating principle of the social organization established by it, namely, equal-

ity before the law of every individual. Whatever may be thought at this day by political scientists or theorists as to the ideal government or society, the conception of our forbears was a government not primarily for its own convenience, but for the protection of the individual rights of those who were to live under it. Government was not the end but merely the means to secure individual liberty and happiness.

The question is whether equality before the law is maintained when one is required to pay for support of government a higher rate than another upon an entirely similar kind and amount of property or an entirely similar right, privilege, or transaction because he is either poorer or richer than another. Under the present law the second cousin recipient of $25,000 or less pays four cents upon each dollar, while the second cousin recipient of $50,000 pays five, and he who receives a million pays over ten. Or, to state the situation in another way, one receiving $25,000 pays for the privilege or on the transaction $1,500 if he also receives another $25,000, or $3,000 if he receives other $500,000; while another, in the same propinquity, pays but $1,000 upon the privilege or transaction of receiving $25,000 if he receives no more. Remember that if such classification as this is legitimate, if the rate may be varied according to the magnitude of the bequest or inheritance, the legislature, in its wisdom, may invert the variation and charge the higher rate on the smaller amount, with progressive diminution as the amount increases; may charge the recipient of $25,000 twelve per cent. thereon, the recipient of a second $25,000 only ten per cent., and, finally, the recipient of $25,000 in excess of $500,000 only the basic rate of four per cent. These illustrations will serve concretely to present the question whether this is equality before the law such as the founders of our state contemplated. Let me ask my brethren of the majority whether, if there were no uniformity clause but merely the assurance of equality, they would deem permissible a law

taxing a $50,000 house either twice the rate or one half the rate laid on a $10,000 one. I cannot believe any of them would answer in the affirmative.

Nothing seems to me more an outrage upon equal rights than discrimination by the law in favor of or against either the poor or the rich by reason of that fact, and nothing seems more to threaten the permanence and safety of society. True, one witnesses with more equanimity unequal and excessive burdening of those who can endure it without actual privation or physical suffering; but, if the principle of classification on such lines be established, what assurance can we have that the burdens will remain there? Under a republican form of government a class once formed may gain ascendency in control of government, and, if a political classification of our people into the rich and the poor be brought about, which is likely in the long run to dominate? Intelligence, education, and energy have always proved superior to mere numbers, and where are these qualities more likely to predominate? Will it not be with the class which contains those who have been able to conquer in the fields of industry, commerce, and finance, and who, in those fields, have been able to bring under their control the armies of men whose existence depends on daily labor? Political warfare between such classes is to be deplored, but, if the issue be forced, mere numbers must, for a time at least, be subordinated, and we face a probability that the principle sustained in this law may be reversed in its application. In equality before the law is the only assurance of opportunity to each to gain social equality and equal prosperity with any other. True, the supreme court of the United States has held such progressive rates of taxation not forbidden by the XIVth amendment to the federal constitution prohibiting denial of "equal protection of the laws," but I nowhere find any satisfying argument to show that amount or value of property or right is a legitimate distinction germane to a classification of it for varying rates of a tax or

excise based on value.   Indeed, that court seems to have re-
frained from interfering on the ground that the XIVth
amendment was not intended to restrain the discretion of the
states in the field of taxation.   However, the decisions of the
supreme court of the United States upon the meaning of the
XIVth amendment are not controlling upon us in measuring
the equality which our constitution secured many years before
that amendment was framed.   The reasoning of such cases as
*State ex rel. Garth v. Switzler,* 143 Mo. 287, 331, 45 S. W.
245; *State ex rel. Schwartz v. Ferris,* 53 Ohio St. 314, 41 N.
E. 579; *Estate of Cope,* 191 Pa. St. 1, 21, 43 Atl. 79;
BREWER, J., in his dissenting opinion in *Magoun v. Ill. T. &
S. Bank,* 170 U. S. 283, 301, 18 Sup. Ct. 594, seems to me
sound and convincing, and to at least so throw in conflict the
authorities that the conclusion reached by my brethren ought
to be supported by some reasoning other than mere deference
to authority.

CASSODAY, C. J. (*dissenting*).   I am forced to dissent re-
spectfully from the decision of the court in this case.   I con-
cur with the conclusion of my brother DODGE, that ch. 44,
Laws of 1903, is unconstitutional and void.   I will simply
add that, to my mind, it is very obvious that that act imposes
a tax upon property within the meaning of the clause of the
constitution which declares that "the rule of taxation shall
be uniform, and taxes shall be levied upon such property as
the legislature shall prescribe" (sec. 1, art. VIII, Const.).
It purports to be a "tax imposed on property of any kind
transferred."   Sec. 1.   It is therein declared that "the tax
so imposed shall be upon the clear market value of such prop-
erty at the rates hereinafter prescribed and only upon the
excess of the exemptions hereinafter granted."   Subd. 6,
sec. 1.   It is also therein declared that "every such tax shall
be and remain a lien upon the property transferred until
paid, and the person to whom the property is so transferred

and the administrators, executors, and trustees of every estate·
so transferred shall be personally liable for such tax until its.
payment." Sec. 5. The several exactions made in the act
are each and all based upon and measured by property. My
reasons for saying that the act imposes a tax on property
within the meaning of the constitutional clause quoted are
sufficiently stated in my separate opinion in the case of *State
v. Railway Cos.* [128 Wis. 449] decided herewith. Being
a tax on property, it was, as indicated in that opinion, subject
to classification "founded upon real differences, affording ra-
tional grounds for a distinction." *Black v. State,* 113 Wis..
205, 219, 89 N. W. 522. In my judgment such classifica-
tion cannot be founded upon mere differences in value, as in
the act in question. On the contrary, such classification, to·
my mind, is purely arbitrary and highly destructive of the·
equal rights guaranteed by the constitution.